**UNITED STATES of America,
Plaintiff-Appellee,**

**v.**

**Donald D. DIAL and Horace G.
Salmon, Defendants-Appellants.**

**Nos. 83–3172, 84–1339.**

United States Court of Appeals,
Seventh Circuit.

Argued Nov. 8, 1984.

Decided March 19, 1985.

Rehearing and Rehearing En Banc
Denied April 12, 1985.

Daniel W. Gillogly, Asst. U.S. Atty., Dan K. Webb, U.S. Atty., Chicago, Ill., for plaintiff-appellee.

David P. Schippers, Chicago, Ill., for defendants-appellants.

Before WOOD and POSNER, Circuit Judges, and DUMBAULD, Senior District Judge.[*]

POSNER, Circuit Judge.

Donald Dial and Horace Salmon were found guilty by a jury of mail and wire fraud (18 U.S.C. §§ 1341 and 1343) in connection with the trading of silver futures on the Chicago Board of Trade. Dial was sentenced to 18 months in prison to be followed by 5 years on probation, and was fined $16,000. Salmon was sentenced to 5 years on probation with 30 days of this period to be spent in work release (meaning that he will work during the day but sleep in jail), and was fined $15,000 and ordered to do 500 hours of community service.

The main argument of the appeals is that the conduct in which the defendants engaged was not fraudulent. To understand this argument you must know something about commodity futures. For background see Carlton, *Futures Markets: Their Purpose, Their History, Their Growth, Their Successes and Failures*, 4 J. Futures Mkts. 237 (1984); Chicago Board of Trade, Commodity Trading Manual (1982); Chicago Board of Trade, Silver Futures: Another New Dimension (1969); *Leist v. Simplot*, 638 F.2d 283, 286–88 (2d Cir.1980), aff'd under the name of *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran*, 456 U.S. 353, 102 S.Ct. 1825, 72 L.Ed.2d 182 (1982). A futures contract is a contract for the sale of a commodity at a future date; but unlike a forward contract, which it otherwise resembles, a futures contract rarely results in actual delivery of the commodity. Suppose that today, a day in March, the price of silver for delivery in June is $4 an ounce, but you think the price will go up to $5 by the time June rolls around. You would then buy June silver at $4. The person on the other side of the contract, the seller, presumably thinks differently—that the price in June will be $4 or lower. You are "long" on the contract; you expect the price to rise. He is "short"; he expects it to fall. As the months go by, the price of June silver will change as more and more information becomes available on the likely demand and supply of silver in June. Suppose in May the price hits $5 and you want

[*] Hon. Edward Dumbauld of the Western District of Pennsylvania, sitting by designation.

to take your profit. All you have to do is sell the contract for $5; you don't have to worry about ending up with a pile of silver to dispose of. Nor need the person who sold you the silver for $4, and who probably never had any silver, have to worry about getting some and delivering it in June to the person to whom you sold your contract. All he has to do in order to take his loss and get out of the market is buy (at $5) the same amount of June silver that he had agreed to sell; the two contracts cancel, and he is out of the market.

What we have described is speculation but not, as the defendants contend, gambling. Commodity futures trading serves a social function other than to gratify the taste for taking risks—two other social functions in fact. It increases the amount of information that the actual consumers of the commodity (mainly, in the case of silver, manufacturers of film, electronics, and jewelry) have about future price trends, by creating incentives for investors and their advisers to study and forecast demand and supply conditions in the commodity. And it enables the risk-averse to hedge against future uncertainties. Suppose a jewelry manufacturer knows that it will need a certain amount of silver in June and is worried that the price might be very high by then. By buying June silver futures at $4 it can place a ceiling on what the silver will cost it (sellers can hedge similarly, by selling futures). Suppose that by June the price has risen to $5. When the manufacturer buys silver then, it will have to pay $5; but by selling its futures contract (to someone who had gone short on June silver) just before delivery is due, for $5, which is to say at a profit of $1, the manufacturer ends up paying a net of only $4 for the silver. The manufacturer could have hedged by means of a forward instead of a futures contract, that is, by signing a contract with a silver company for delivery in June at $4. But then it would have to locate and negotiate with a particular seller in advance, rather than wait till June when it will actually want the silver and buy then at the current price ($5). Since futures contracts are standard contracts—for example, the Chicago Board of Trade's silver futures contract in the period relevant to this case was a contract for 5,000 troy ounces of silver of a specified grade and quality—there is no negotiation over terms; and since the transaction is guaranteed by the clearing members of the exchange, see *Bernstein v. Lind-Waldock & Co.*, 738 F.2d 179, 181 (7th Cir.1984), the buyer does not have to worry about whom he is dealing with.

Traders on a commodity futures exchange will, however, want some assurance that there are no people in the market who have preferential access to information. If there are known to be such people, the other traders will tend to leave the exchange for other exchanges that do not have such people—and several commodity exchanges besides the Board of Trade offer trading in silver futures contracts. If trading is "rigged" on all commodity futures exchanges, there will be less commodity futures trading, period, and the social benefits of such trading, outlined above, will be reduced. The greatest danger of preferential access comes from the brokers, who often trade on their own account as well as for their customers. Brokers have more information than any of their customers because they know all their customers' orders. Suppose a customer directs his broker to buy a large number of silver futures contracts. The broker knows that when he puts this order in for execution the price will rise, and he can make it rise further if he waits to execute the order until he can combine it with other buy orders from his customers into a "block" order that will be perceived in the market as a big surge in silver demand. If, hoping to profit from this knowledge, the broker buys silver futures on his own account just before putting in the block order and then sells at the higher price that the block order generates, he will hurt his customers. His purchase (if substantial) will have caused the market price to rise just before the block order went in, and thus the price that his customers pay will be higher than otherwise; and his sale will cause the price to fall, and

thus reduce the value of his customers' contracts. So if "trading ahead"—as the practice of a broker's putting in his own orders for execution ahead of his customers' orders is called—became widespread, customers would realize that the market was rigged against them. And trading ahead serves no social function at all. The broker obtains a profit from information that he has not invested in producing but that comes to him automatically in his capacity as a broker. It is like a lawyer's discovering that his client is about to make a takeover bid for another company and rushing out and buying some of that company's stock before the bid is made public.

Against this background we consider the facts as the jury could reasonably have found them in the government's favor. Dial, an experienced silver trader, was the manager of a branch office of the Clayton Brokerage Company. Salmon was the company's president. In 1978 Dial was looking for a very large investor to make a multi-million dollar purchase of silver futures through Clayton Brokerage. In preparation for the appearance of such an investor Salmon arranged for Dial to control a trading account at Clayton Brokerage in the name of Multi-Projects (Cayman), Ltd., a Cayman Islands corporation. An "equity raiser" named Kirst located on Dial's behalf the putative grand investor in the person of Nasrullah Khan, who said he represented a group of investors organized as the International Monetary Corporation (IMC). While negotiations between Khan and Dial's son were proceeding, Dial began buying silver futures for the Multi-Projects account. But he put up no cash or cash equivalent for these purchases. To understand the significance of this omission, recall that a futures contract commits each of the contracting parties to buy or sell the underlying commodity at a date in the future at whatever the market price then is. Since the brokerage house (here, Clayton Brokerage) is responsible for the undertakings in its customers' futures contracts, it wants to be sure that each customer has the financial wherewithal to make good on his obligation under his futures contract

should the price move in the opposite direction from his expectations. To this end, the brokerage house requires each of its customers to put up "margin"—cash or a cash equivalent such as a Treasury bill—as a guarantee of solvency. The required margin is a (small) percentage of the contract price and fluctuates as the price fluctuates.

Brokerage houses naturally keep very close tabs on their margin accounts, insisting that as the price of the futures contracts bought on margin fluctuates the buyer increase his margin (if necessary—it will be necessary for the long if the market price of the futures contract falls, and for the short if the price rises) so that the brokerage house will always have a cushion under its guarantee of its customers' transactions. Therefore when Dial bought silver futures for the Multi-Projects account without putting up any cash or cash equivalent—bought a lot of silver futures, 200 in all, worth $5 million—Clayton Brokerage Company's computer department notified its margin department that margin calls amounting to $100,000 should be issued to Multi-Projects, and they were. But Salmon instructed the director of the computer department to delete the Multi-Projects account from its computer programs and as a result the margin calls (which were never met) stopped.

On the weekend of November 10, 1978, at a time when Dial's personal trading account was in a perilous position (he had put up $1 million in Treasury bills against margin calls and all but $6,000 had been debited to meet them), negotiations with Khan were successfully concluded and Kirst was dispatched to London to pick up IMC's check for $25 million. On the same weekend Dial engaged in intensive solicitation of his regular customers to create a block order for silver futures to put in for execution on Monday, November 13. Kirst as directed deposited IMC's check—drawn on the Oxford International Bank in the Turks and Caicos Islands, and not certified—on Monday morning in Clayton Brokerage Company's account in a Chicago bank. Be-

tween 8:43 a.m. and 12:15 p.m. Salmon transmitted to the floor of the Board of Trade an order to buy 12 February (1979) silver futures contracts, and Dial transmitted orders on behalf of Multi-Projects, himself, his son, and Kirst and other associates, including two secretaries, for a total of 262 February futures. During this period the price of February silver fluctuated between $5.83 and $5.86 an ounce. At 12:40 p.m. Dial put in the block order, which was to buy 583 February futures, at higher prices—between $5.88 and $5.90. At 12:59 (two minutes after having bought 2,000 December futures for IMC), Dial bought 1,192 February futures for IMC at $5.92. Later that afternoon Salmon sold 10 of his 12 February futures at $5.91, seven cents more than he had bought them for that morning. The price kept on rising as the afternoon wore on, until it reached its limit—a 20 cent rise from the opening price. (Exchanges impose daily limits on price fluctuations; no trading is allowed at prices outside of the limits.)

At some point during the day, Dial and Salmon learned that Khan's check had not been certified. Yet Dial, authorized by Salmon, continued in the following days to buy silver futures heavily for IMC's account, even as it became increasingly likely from communications with the Oxford Bank that the check would never clear. On November 28 Dial decided the price of silver was now too high. He placed an order to sell 200 February silver futures contracts for the Multi-Projects account at $6.13. He had again assembled a block order (also to sell) from his customers, which he placed ten minutes after the Multi-Projects order and which was executed at lower prices than all but eight of the Multi-Projects contracts. The IMC check never did clear, and eventually the account was liquidated—at a profit. However, we were told at argument that in subsequent silver trading Dial was wiped out.

The surge of buy orders on November 13 caught the attention of Board of Trade officials and the Commodity Futures Trading Commission. Only 1,587 February silver futures contracts had been traded on the most recent trading day, November 10; 4,756 were traded on November 13. The closing price for February silver futures on the Board of Trade on November 13 had been 13 cents higher than the closing price on the New York Commodity Exchange, where a similar futures contract is traded—an unusual discrepancy between such close substitutes. The Board and the Commission began an investigation of Clayton Brokerage Company's trading of the IMC account. Dial and Salmon lied (under oath) a number of times in the course of this investigation—Dial saying for example that he had not learned that IMC's check was not certified until the week of November 28 (and later admitting that he had known this on November 13), Salmon for example denying his interest in Multi-Projects.

The question for decision is whether the conduct we have described amounts to a fraud; if so, the defendants are guilty of federal wire and mail fraud, as there is no dispute that the telephone and the mails were used extensively. Although stiff federal criminal penalties for commodity dealers who defraud or attempt to defraud their customers were added to the Commodity Futures Trading Act on October 1, 1978, see 7 U.S.C. §§ 6b(A), 13(b), about six weeks before the defendants' scheme fructified in the trading on November 13, 1978, the defendants were not charged under these sections (they were, however, charged with and acquitted of filing a false report under another section), perhaps because the ambiguous wording of section 6b, on which see 1 Bromberg & Lowenfels, Securities Fraud & Commodities Fraud § 4.6(452) (1984), makes it an uncertain vehicle for a criminal prosecution.

The defendants do not argue that the Commodity Futures Trading Act supersedes the federal mail or wire fraud statutes, and are wise not to make the argument. See e.g., *United States v. Brien*, 617 F.2d 299, 309–11 (1st Cir.1980). But they emphasize that none of the defendants' customers, or the defendants' employer, Clayton Brokerage Company, lost money as a result of their acts and that there is

no statute, regulation, or Board of Trade rule that specifically forbids insider trading in commodity futures (as in securities), or block trading, or trading ahead (other than by floor brokers—the brokers who actually execute the trades on the floor of the exchange—which the defendants were not). Rule 150(b) of the Board of Trade, forbidding "trad[ing] systematically against the orders or position of his customers," may implicitly forbid trading ahead by any broker; but the only specific rule the defendants violated was the Board of Trade's Rule 210, which requires that accounts be margined. Neither the Multi-Projects account nor the IMC account was margined— the latter not only because IMC's check was no good but because margin must be in cash or a cash equivalent, such as a certified check.

■ But we think there was a scheme to defraud in a rather classic sense, which is obscured only because commodity futures trading is an arcane business— though not to these defendants. Fraud in the common law sense of deceit is committed by deliberately misleading another by words, by acts, or, in some instances—notably where there is a fiduciary relationship, which creates a duty to disclose all material facts—by silence. See Prosser and Keeton on the Law of Torts §§ 105–06 (5th ed. 1984). Liability is narrower for nondisclosure than for active misrepresentation, since the former sometimes serves a social purpose; for example, someone who bought land from another thinking that it had oil under it would not be required to disclose the fact to the owner, because society wants to encourage people to find out the true value of things, and it does this by allowing them to profit from their knowledge. See *Laidlaw v. Organ*, 15 U.S. (2 Wheat.) 178, 195, 4 L.Ed. 214 (1817); Kronman, *Mistake, Disclosure, Information, and the Law of Contracts*, 7 J. Legal Stud. 1 (1978). But if someone asks you to break a $10 bill, and you give him two $1 bills instead of two $5's because you know he cannot read and won't know the difference, that is fraud. Even more clearly is it fraud to fail to "level" with one to whom one owes fiduciary duties. The essence of a fiduciary relationship is that the fiduciary agrees to act as his principal's alter ego rather than to assume the standard arm's length stance of traders in a market. Hence the principal is not armed with the usual wariness that one has in dealing with strangers; he trusts the fiduciary to deal with him as frankly as he would deal with himself—he has bought candor.

■ As a broker, and therefore, the defendants concede (as they must, see, e.g., *Marchese v. Shearson Hayden Stone, Inc.*, 734 F.2d 414, 418 (9th Cir.1984)), a fiduciary of his customers, Dial, when he solicited his customers to participate in block orders, implicitly represented to them that he would try to get the best possible price. He could have gotten a better price by putting their orders in ahead of the orders he placed for his own accounts and those of his friends. In trading ahead of his customers without telling them what he was doing, he was misleading them for his own profit, and conduct of this type has long been considered fraudulent. See *SEC v. Capital Gains Research Bureau, Inc.*, 375 U.S. 180, 183, 194–95, 84 S.Ct. 275, 278, 284, 11 L.Ed.2d 237 (1963).

Although the defendants' expert witness testified to the effect that trading ahead does not violate the ethical standards of commodity futures trading, the jury did not have to believe this improbable testimony— by a witness who was a personal friend of Dial. (And the government presented its own expert, who gave contrary testimony.) It is true that the Board of Trade has no express rule against trading ahead of a customer (other than by a floor broker) and that there is no other specific prohibition (relevant to this case) of insider trading on commodity futures exchanges. See CFTC, A Study of the Nature, Extent and Effects of Futures Trading by Persons Possessing Material, Nonpublic Information, submitted to H.R. Comm. on Agriculture and Sen. Comm. on Agriculture, Nutrition and Forestry (Sept.1984). But it is apparent that

such a practice, when done without disclosure to the customer, is both contrary to a broker's fiduciary obligations and harmful to commodity futures trading, because it means that a person wanting to engage in such trading can trade only through an agent who has a conflict of interest. Cf. *Chasins v. Smith, Barney & Co.*, 438 F.2d 1167, 1172 (2d Cir.1970).

The federal mail and wire fraud statutes have often been used to plug loopholes in statutes prohibiting specific frauds, see *United States v. Maze*, 414 U.S. 395, 405–08, 94 S.Ct. 645, 651–652, 38 L.Ed.2d 603 (1974) (dissenting opinion), a pertinent example being the application of the mail fraud statute to insider trading in securities before the promulgation of the SEC's Rule 10b–5. See *United States v. Groves*, 122 F.2d 87, 89 (2d Cir.1941). Although some scholars question the appropriateness of prohibiting insider trading by corporate officers, pointing out for example that (at least if short selling by insiders is prohibited) it gives officers a greater incentive to take risks that may benefit the shareholders, see, e.g., Carlton & Fischel, *The Regulation of Insider Trading*, 35 Stan.L.Rev. 857 (1983), we would be surprised to find anyone saying a good word for insider trading by a broker; the only information he exploits is his knowledge of his customers' intentions.

■ The fraud was not only Dial's, but Salmon's, who was Dial's boss, knew what was going on, furthered the scheme by arranging for Dial to use the Multi-Projects account, and profited personally from the fraud along with Dial (indeed, more directly than Dial, who did not sell silver on his own account, as Salmon did, on November 13). Dial and Salmon not only defrauded their own customers; they also defrauded the people from whom they bought silver futures contracts, and their employer, the Clayton Brokerage Company, by trading, without margin, the Multi-Projects and IMC accounts. Trading without margin gives a misleading signal, because a signal not backed by any cash. If you had no assets at all, and could buy futures con-

tracts at will (say $25 million worth), you could have a powerful influence on futures prices. Yet you might be totally irresponsible and incompetent in forecasting such prices, and might therefore reduce the accuracy of the market as a device for forecasting price; for you would lack the stimulus to sober reflection that comes from having to put one's money where one's mouth is. Trading without margin also shifts risk from the trader to the broker, in this case from Dial and Salmon to their employer, the Clayton Brokerage Company, which would have had to make good any losses on the Multi-Projects and IMC accounts. This risk was not disclosed to Clayton Brokerage any more than trading ahead was disclosed to the defendants' customers or the lack of cash backing for the enormous buying by Multi-Projects and IMC was disclosed to those who sold futures contracts to the defendants and their associates. Far from disclosing what they were doing, Dial and Salmon actively concealed it by using an account with an uninformative name (Multi-Projects) and by Salmon's ordering the deletion of the Multi-Projects account from Clayton Brokerage Company's computer records. The defendants' failure to disclose to their employer what was going on was a breach of the defendants' fiduciary duty as employees. Although they owed no similar duty to people on the other side of their silver futures transactions, their trading an unmargined account was an active misrepresentation and hence actionable even without a breach of fiduciary duty.

■■ It is true that no one "lost money," because silver prices were rising for reasons other than the defendants' unmargined trading. If that trading had been the only thing jacking up the price, the price would have collapsed when the IMC account was liquidated—and it did not; between November 1978 and February 1980, the average monthly price of silver rose to $38.27 per ounce. But the analysis is incomplete. The defendants' customers did lose money—the additional profit they would have made if the defendants had placed their customers' orders ahead of

rather than behind their own orders. And Clayton was subjected to the risk of having to make good what might have been $25 million in trading losses in the IMC account. The risk did not materialize, but just as it is embezzlement if an employee takes money from his employer and replaces it before it is missed, see, e.g., *United States v. Bailey*, 734 F.2d 296, 304 (7th Cir.1984), so it is fraud to impose an enormous risk of loss on one's employer through deliberate misrepresentation even if the risk does not materialize. See, e.g., *United States v. Lindsey*, 736 F.2d 433, 436–37 (7th Cir.1984); *United States v. Bush*, 522 F.2d 641, 648 (7th Cir.1975); cf. *United States v. Feldman*, 711 F.2d 758, 763–64 (7th Cir.1983). Finally, the defendants confused the market by signaling the presence of big buyers who had not in fact put up any money (IMC and Multi-Projects); and to undermine the confidence on which successful futures trading depends is to harm the exchanges, and the society at large. The evidence that the defendants' misrepresentations were deliberate was overwhelming, beginning with the establishment of an offshore trading operation in an uninformative name; continuing with the timing of the defendants' purchases for their own and their friends' accounts ahead of the block order and the IMC orders, all carefully orchestrated over the preceding weekend; culminating in the defendants' repeated lies to the investigating authorities; and including the violation of the margin requirements (Rule 210 of the Board of Trade) and the concealment of the defendants' interests in the Multi-Projects account. It is inessential whether the defendants also violated Rule 150(b).

Concern has been expressed with the possible abuse of the mail and wire fraud statutes to punish criminally any departure from the highest ethical standards. When the broad language of the statutes ("Whoever, having devised or intending to devise any scheme or artifice to defraud ..."), which punishes the scheme to defraud rather than the completed fraud itself, is read by the light of the broad concept of fraud that has evolved in civil cases and the precept that the mail and wire fraud statutes

are not confined to common law fraud, *Durland v. United States*, 161 U.S. 306, 312–13, 16 S.Ct. 508, 510–11, 40 L.Ed. 709 (1896), concern naturally arises that the criminal law will be used to hold businessmen to the maximum, rather than minimum, standards of ethical behavior. See, e.g., Coffee, *Some Reflections on the Criminalization of Fiduciary Breaches and the Problematic Line Between Law and Ethics*, 19 Am.Crim.L.Rev. 117 (1981). It is not allayed by such popular formulations of the test for mail or wire fraud as the Fifth Circuit's in *Gregory v. United States*, 253 F.2d 104, 109 (5th Cir.1958), which continues to be repeated with approval, see, e.g., *United States v. Bohonus*, 628 F.2d 1167, 1171 (9th Cir.1980): fraud is whatever is not a "reflection of moral uprightness, of fundamental honesty, fair play and right dealing in the general and business life of members of society." Courts have been more concerned with making sure that no fraud escapes punishment than with drawing a bright line between fraudulent, and merely sharp, business practices, even though the universality of telephone service has brought virtually the whole commercial world within the reach of the wire-fraud statute. But we need not explore the outer bounds of mail and wire fraud in this case. The defendants' elaborate efforts at concealment provide powerful evidence of their own consciousness of wrongdoing, cf. *United States v. Bryza*, 522 F.2d 414, 422 (7th Cir.1975), making it unnecessary for us to decide whether the same conduct, done without active efforts at concealment, would have been criminal.

The only other question that merits discussion is Dial's challenge to the admission of Salmon's statement, made to a co-conspirator in July 1978, that Dial would be controlling the Multi-Projects account and trading on behalf of the co-conspirator and another associate of the defendants. Dial says there is no evidence that he joined any conspiracy before October; but all that matters, see *United States v. Harris*, 729 F.2d 441, 448 (7th Cir.1984), is that there was a conspiracy in existence then which he might have joined later; and the

existence of the conspiracy need only be proved by a preponderance of the evidence, *United States v. Coe,* 718 F.2d 830, 835 (7th Cir.1983).

The statement in question was made in connection with the defendants' use of the Multi-Projects trading account, an essential step in the scheme to defraud. By August, the month after the statement, the conspiracy was in high gear. Salmon had directed the deletion from Clayton's computer records of the status calls on the Multi-Projects account, while Dial himself had already begun unmargined trading in the account and had sent his son to London to negotiate with Khan. The jury could reasonably find that these events had not been spontaneous, that the elaborate scheme which reached fruition on November 13 must have been long in preparation, that Salmon's statement must have been in reference to that conspiracy, and indeed (though this was unnecessary) that the dominant role that Dial played throughout showed that he must have been present at the creation in July.

AFFIRMED.