FRANK, Judge.
Lebert Franklin Batten has appealed from convictions and sentences for organized fraud, communications fraud, acting as a motor vehicle dealer without a license and unlawfully representing himself to be an attorney. Batten has raised and we have considered each of the seven issues in *961 the attack upon his convictions.[1] We affirm.
Our research has revealed only one opinion from a Florida appellate court touching upon the Florida Communications Fraud Act (Act), § 817.034, Fla.Stat. (1989). In Donovan v. State, 572 So.2d 522 (Fla. 5th DCA 1990), Judge Sharp refers to the Act but only to the extent necessary in determining a double jeopardy contention. The resolution of Donovan did not require the degree of inquiry into the Act we undertake in this opinion. Thus, we write in an attempt to elucidate the purpose of the Act, and the manner in which it is to operate.
Section 817.034(l)(b), Florida Statutes, describes the legislature’s intent in enacting the Act and prescribes a source of authority for its implementation:
... to prevent the use of communications technology in furtherance of schemes to defraud by consolidating former statutes concerning schemes to defraud and organized fraud to permit prosecution of these crimes utilizing the legal precedent available under federal mail and wire fraud statutes.
A “scheme to defraud” as that phrase is used in the foregoing section is defined in section 817.034(3)(d) as:
... a systematic, ongoing course of conduct with intent to defraud one or more persons, or with intent to obtain property from one or more persons by false or fraudulent pretenses, representations, or promises or willful misrepresentations of a future act.
Our analysis of this matter begins with the information. Count I alleges that Batten “did engage in a systematic, ongoing course of conduct, with intent to defraud one or more persons, or with intent to obtain property from one or more persons, by false or fraudulent pretenses, [or] representations” pursuant to which he “obtained property valued at less than $20,000, contrary to Chapter 817.034(1)(3).” Counts II and III allege that Batten “did engage in a scheme to defraud, and in furtherance of that scheme did communicate with James D. Keyse and Frank D’Ambrosio with intent to obtain property ... [from each of them] in the amount of $300 or more, contrary to Chapter 817.034(4)(b)(l).”
The evidence developed in support of the information’s allegations disclosed that James Keyse purchased a 1979 Chrysler from Batten in June, 1988. The car had been located on a vacant lot with a “For Sale” sign. While test driving the automobile, Batten told Keyse that he dealt strictly in estate cars and that he was an attorney. Keyse signed a form giving Batten power of attorney; Batten suggested he could do the title work and save Keyse from having to wait at the title bureau. A document from the Department of Transportation showed that no sales tax was paid on the vehicle. Keyse did not receive his tag and title.
Frank D’Ambrosio testified that in December, 1988, he bought a car from Batten that had been advertised in the newspaper as an estate sale. D’Ambrosio met Batten at a Publix store to see the car. Batten said he was a lawyer settling an estate and had to get rid of the car. D’Ambrosio bought the automobile for $2,900. Batten told him to tell the motor vehicle personnel that the car cost only $1,200 so they could each save on the tax.
Without recounting all of the evidence disclosing Batten’s “systematic, ongoing course of conduct” to sell cars and obtain money through the conjunction of available methods of communication with false and fraudulent pretenses, or representations, we find the following summarization of the testimony of several witnesses sufficient to bring Batten’s activity within the reach of the Act’s proscriptions:
Clyde G. Mackey bought a Cadillac from appellant on July 14,1986. The car was advertised in the paper by Batten to settle an estate. Batten told Mackey *962 that he was an attorney specializing in settling estates.
Linda Palmer testified that she was an inside sales division manager at the St. Petersburg Times and the custodian of records for phone installations, rentals, and all other business. She investigated Batten’s file and found that during the first three months of 1988, he placed several ads in the paper to sell automobiles, using at least three different names (Robert Smith, Robert Brown, and Robert Jones) and three different telephone numbers. The typical ad placed by Batten said, “Lincoln 1979 Town Car, perfect, low miles, estate, must sell, best offer, 345-9354 any time.”
In late 1987 and early 1988, William Critelli worked for the Silver Sands Development Corporation where Batten leased a condominium unit. Critelli testified that Batten requested an extra telephone line. Batten had at least four extra cars that were parked in other people’s places with the result that Batten was asked to move the cars. Batten told Critelli the cars were for sale.
James Kebel, a custodian of records for General Telephone Company stated that his investigation showed at least two phone numbers that were call forwarded to the two lines in the leased condominium.
Hugh Forsythe, who worked part-time for Batten between June, 1988 and May, 1989, testified that his job was to drive cars from a body and fender shop to Batten’s residence, to parking lots or other persons’ homes. During that time, Forsythe picked up, drove, or washed as many as three dozen different cars for Batten.
Larry Krick, a criminal investigator assigned to the special investigations section of Pinellas County Department of Consumer Affairs, testified that he responded to an advertisement in the newspaper on April 27,1989. Krick called the phone number listed and a man identifying himself as “Lee” answered. Krick arranged to meet Batten in the parking lot of the Grant Plaza K-Mart. Batten informed Krick that the vehicle was an estate car, but that the owner was an elderly gentleman who was still alive. The two men negotiated over the purchase price. Krick signed a power of attorney form, which in normal practice enables the auto dealership to take care of the steps necessary to register the car in the buyer’s name. Batten had several additional pre-signed, pre-stamped power of attorney forms in his possession. Later, on May 3, 1989, Krick observed the meeting between Daño and Batten. He testified that Batten possessed and offered for sale at least three cars in addition to the one he drove to the meetings. Batten also told Krick that he had “secured these vehicles from attorneys.”
John Kilpatrick testified that he is in the towing business and in July or August, 1988, he towed seven of Batten’s cars from a vacant lot. Kilpatrick also towed five cars from Batten’s condominium parking area. From the end of 1987 until the end of 1989, Kilpatrick said he moved up to twenty vehicles for Batten.
Ralph Miller testified that he had done some title work for Batten. When shown the power of attorney form signed by Keyse, Miller testified that the notary stamp looked like his, but the notary’s signature was not his.
Mr. Vicario testified that in March and April of 1988, he rented a room in his house to appellant. During this time, Vicario overheard Batten talking on the phone to people who had responded to the ads for the sale of cars. In most instances, Batten claimed he was an attorney. He told the callers he wanted to “sell the estate, get rid of it, and didn’t want to fool with it.”
At first blush, one might wonder how Batten’s behavior can be condemned as criminal. The purchasers of Batten’s cars, Keyse and D’Ambrosio, received the automobiles they had agreed to buy and consensually paid the ultimate amounts of money Batten accepted. He, however, identified the cars as originating in estates, suggesting through that representation that they were not “used cars” in the customary sense, and he complemented the suggestion *963 with reference to himself as the attorney for the vending estate. The test of whether Batten’s conduct offended the Act is not, as we show below, dependent upon loss or other detriment, as might be the case in a common law or other statutory fraud setting. See, e.g., Bruce v. Stork’s Nest, Inc., 477 So.2d 51 (Fla. 2d DCA 1985). The conclusion we have reached in this regard flows from the legislature’s grant to the judiciary of the freedom to utilize “legal precedent available under federal mail and wire fraud statutes.” § 817.034(l)(b). Fla. Stat.
Before turning to the federal authorities pertinent to this proceeding, it is appropriate to note that the Act appears to have been patterned in substantial part after the federal wire and mail fraud statutes, 18 U.S.C. §§ 1341 and 1343. At the heart of the Act and the two federal statutes is thé concept of “a scheme to defraud” with the utilization of communication techniques as the means to accomplish a deceitful objective. Thus, we perceive no distinction having any bearing upon the outcome we reach between the newspaper ads Batten purchased and the use of the mails, as Batten’s method of communication would be implicated in an interstate setting violative of 18 U.S.C. § 1341. Moreover, there is no functional difference between Batten’s use of the telephone within Pinellas County to accomplish his illicit purposes and those instances where interstate telephoning subtends a violation of 18 U.S.C. § 1343. Thus, the “means-objective” relationship contemplated by the Act is in parallel with the federal statutes and the manner in which the federal judiciary has enforced those statutes.
It is settled beyond cavil that to achieve a conviction under the mail fraud statute, 18 U.S.C. § 1341, the government need only prove a scheme to defraud and the use of the mail system for the purpose of executing the scheme. Pereira v. United States, 347 U.S. 1, 74 S.Ct. 358, 98 L.Ed. 435 (1953). Specific intent to use the mails in furtherance of the scheme is not an element of the offense. United States v. Young, 232 U.S. 155, 34 S.Ct. 303, 58 L.Ed. 548 (1914). These same principles are applicable to violations occurring under the wire fraud statute. 18 U.S.C. § 1343; Carpenter v. United States, 484 U.S. 19, n. 6, 108 S.Ct. 316, n. 6, 98 L.Ed.2d 275 (1987). To sustain a conviction under either of the federal statutes,
[i]t is enough ... that the government charge and the jury find either that the victim was actually deprived of money or property or that the defendant intended to defraud the victim of the same. A scheme to defraud, whether successful or not, remains within the purview of section 1341 as long as the jury was required to find an “intent to obtain money or property from the victim of the deceit.” United States v. Lew, 875 F.2d 219, 222 (9th Cir.1989).
United States v. Utz, 886 F.2d 1148, 1151 (9th Cir.1989), cert. denied, — U.S. -, 110 S.Ct. 3242, 111 L.Ed.2d 753 (1990).
In reliance upon Utz, the United States Court of Appeals for the Sixth Circuit observed that “[t]he government need only charge that the defendant intended to defraud the victim of money or property, not that the victim was actually deprived of money or property.” United States v. Ames Sintering Co., 927 F.2d 232, 235 (6th Cir.1990). In the face of that which we have extracted from the federal precedents, there is no question that the customary element found in the state fraud cases of loss or deprivation of something of value (see, e.g. Crawford v. State, 453 So.2d 1139 (Fla. 2d DCA 1984)), is not essential to a conviction based upon a violation of the Act. Indeed, the mail and wire fraud statutes are not confined to common law fraud. Durland v. United States, 161 U.S. 306, 16 S.Ct. 508, 40 L.Ed. 709 (1896). See United States v. Oren, 893 F.2d 1057 (9th Cir.1990). Here, no less than was true in United States v. Dial, 757 F.2d 163 (7th Cir.1985), no one appears to have lost money, but the risk of loss may be deemed sufficient to sustain the convictions for violation of 18 U.S.C. §§ 1341 and 1343. Id. at p. 170.
Although it plays no part in our resolution of this proceeding, the reality is that the Act, not unlike the federal statutes, is *964 instinct with a potential for misapplication. Indeed, “[c]oncern has been expressed with the possible abuse of the mail and wire fraud statutes to punish criminally any departure from the highest ethical standards.” Dial, 757 F.2d at 170. Judicial anxiety in the federal setting stems from the broad language of the statutes providing punishment for the “scheme to defraud rather than the completed fraud itself.” Id. The “concern naturally arises that the criminal law will be used to hold businessmen to the maximum, rather than the minimum, standards of ethical behavior.” Id. Be that as it may, we cannot override or ignore the legislature’s determination to create the Act and to provide the standard by which it is to be effectuated. Our uneasiness, no different from that expressed by others in this field, is tempered by the good faith and judgment of those charged with the responsibility to carry out Florida’s regulation of criminal activities. The judiciary, of course, furnishes the oversight capable of remedying abuse. It cannot be said, however, that the prosecution of Batten was abusive. The record manifests an ongoing “scheme to defraud,” composed of acquiring “used cars” and deceptively holding them out as assets of estates. Batten’s use of the newspaper ads and telephone provided the means with which he fulfilled the fraudulent objectives.
Finally, the claim is wholly without merit that the federal statutes as construed in McNally v. United States, 483 U.S. 350, 107 S.Ct. 2875, 97 L.Ed.2d 292 (1987), which was thereafter followed in United States v. Italiano, 837 F.2d 1480 (11th Cir.1988), bar Batten’s conviction under the Act. The Supreme Court’s sole basis for rejecting application of the federal mail fraud statute to McNally’s conduct was grounded upon a record disclosing that the citizens of Kentucky were defrauded in a scheme involving the ultimate payment to McNally of money from excess insurance commissions transmitted through the mails. The Sixth Circuit had concluded that the mail fraud statute condemns schemes to defraud citizens of their intangible rights to honest and impartial government. The Supreme Court disagreed and said, “The mail fraud statute clearly protects property rights, but does not refer to the intangible right of the citizenry to good government.” McNally, 483 U.S. at 356, 107 S.Ct. at 2879-80. In short, Batten’s scheme, unlike those found in McNally and Italiano, was not in any fashion integrated with a public function conferring an “intangible right” upon the people of Florida.[2]
Affirmed.
DANAHY, A.C.J., and PATTERSON, J„ concur.

. We expressly find, contrary to Batten’s contention, that section 817.034, et seq., does not violate the directive contained in Article III, Section 6 of the Constitution of the State of Florida that ‘‘[e]very law shall embrace but one subject and matter properly connected therewith, and the subject shall be briefly expressed in the title."

. Although it has no bearing upon the present proceeding, McNally’s central element focused upon by the Supreme Court was obviated by Congress, effective November 18, 1988, through the enactment of 18 U.S.C. § 1346:
For the purposes of this chapter [18 USCS §§ 1341, et seq.] the term "scheme or artifice to defraud” includes a scheme or artifice to deprive another of the intangible right of honest services.
Section 817.034(3)(c)(2) and (3) contain a like reference. Thus, under those aspects of the Act, it is improbable that Batten's argument based upon an “intangible right,” even if the phrase had any relevance in this matter, would find support in McNally.