Verna **EMERY, on behalf of herself and all others similarly situated,** Plaintiff–Appellant,

v.

**AMERICAN GENERAL FINANCE, INCORPORATED, Defendant–Appellee.**

No. 95–1037.

United States Court of Appeals, Seventh Circuit.

Argued Sept. 26, 1995.

Decided Dec. 14, 1995.

Rehearing and Suggestion for Rehearing En Banc Denied Jan. 31, 1996.*

* Hon. Walter J. Cummings did not participate in the vote for rehearing en banc.

Daniel A. Edelman, Cathleen M. Combs (argued), J. Eric Vander Arend, Michelle A. Weinberg, O. Randolph Bragg, Tara L. Goodwin, Edelman & Combs, Chicago, IL, for Plaintiff–Appellant.

Jonathan N. Ledsky, Craig A. Varga (argued), Peterson & Ross, Chicago, IL, for Defendant–Appellee.

Before POSNER, Chief Judge, and BAUER and COFFEY, Circuit Judges.

POSNER, Chief Judge.

This is a suit for damages under the RICO statute. 18 U.S.C. §§ 1961 *et seq.* The plaintiff, Verna Emery, charges the defendant, American General Finance, a maker of small loans, with engaging in the practice of "loan flipping," a practice that the plaintiff claims is "racketeering activity" within the meaning of RICO. § 1962(c). To be such, it must involve one or more of the crimes listed in section 1961(1), among which (see § 1961(1)(B)), and the only one alleged by the complaint, is mail fraud, prohibited by 18 U.S.C. § 1341. The district judge dismissed the complaint under Fed.R.Civ.P. 12(b)(6) on the ground that the facts alleged do not violate section 1341.

Here is what is alleged. On July 14, 1992, Emery borrowed $1,983.81 from American General Finance, the loan being secured by miscellaneous personal property, including a typewriter and a television set. The finance charge, based on the 36 percent annual rate of interest charged for the loan, was $1,327.08, and the loan was for three years. Six months later, American General Finance wrote a letter to Emery. The letter, signed by a branch manager, reads as follows:

Dear Verna:

I have extra spending money for you.

Does your car need a tune-up? Want to take a trip? Or, do you just want to pay off some of your bills? We can lend you money for whatever you need or want.

You're a good customer. To thank you for your business, I've set aside $750.00 * in your name.

Just bring the coupon below into my office and if you qualify, we could write your check on the spot. Or, call ahead and I'll have the check waiting for you.

Make this month great with extra cash. Call me today—I have money to loan.

_____

* Subject to our normal credit policies.

At the bottom of the letter is a coupon captioned "$750.00 Cash Coupon" made out to Verna M. Emery at her address. Her name and address are preceded by the words "$750.00 cash for:". Small print explains at the bottom, "This is not a check."

Emery wanted a loan, so she responded to the letter. When she showed up in the branch manager's office, he gave her forms for a refinancing of her existing loan with additional funds advanced. The new note which she signed was for an amount financed of $2,399.83 and a finance charge (computed at the same 36 percent interest rate) of $1,641.28, payable over three years. The monthly payment, which had been $89.47 under the original loan, jumped to $108.20

(more for the first payment) for the new loan. Had she not refinanced she would have had to pay $89.47 a month for another 30 months or so (for the refinancing took place approximately six months after the original loan was made), while with the refinancing she had to pay $108.20 for the next 36 months—and this to receive $200. The increment in cost to her came to about $1,200, paid over three years, and this is for the right to get only $200 now. The cost to her of borrowing $200 in this way was roughly three times as great as it would have been had she borrowed that amount for three years in a separate loan at the annual interest rate of 36 percent. By our calculation, the implicit interest rate that she paid for the $200 loan exceeded 110 percent per annum. This was not disclosed on the Truth in Lending Act form that Emery received because the Act treats the transaction as a reborrowing of the original amount of the loan plus $200. So much for the Truth in Lending Act as a protection for borrowers.

We have said that $200 was Emery's benefit from the loan, but the figure may be larger. The difference between the amount financed by the new loan and the amount financed by the old is more than $400. The only cash she received was a check for $200, the rest of the difference being eaten up by increased insurance and other expenses. Perhaps those expenses inured to her benefit. If so the implicit interest rate would be less than 110 percent. These are not details that can be or have to be resolved at the complaint stage.

The complaint alleges, a little less clearly than could be desired but clearly enough, that while the letter sent to Emery and other customers of American General Finance implies that the customer is being offered a separate loan, when the customer shows up to take advantage of the offer the company presents him with papers for refinancing the customer's existing loan with additional funds being advanced and does not disclose, indeed conceals the fact, that this method of obtaining additional funds is much more costly than taking out a new loan. The customers do not understand this, because American General Finance "markets its loans to working-class borrowers who generally do not understand … the computations necessary to determine the comparative cost" of a second loan and a refinancing (with additional funds advanced) of their existing loan. This practice is alleged to be a "scheme or artifice to defraud," and one who having devised such a scheme or artifice uses the mails "for the purpose of executing such scheme or artifice or attempting so to do" violates the mail fraud statute.

The language of the mail-fraud statute is very broad, and concern has repeatedly been expressed that it not be given too vague and encompassing a scope by judicial interpretation. E.g., *United States v. Dial*, 757 F.2d 163, 170 (7th Cir.1985); *United States v. McNeive*, 536 F.2d 1245, 1252 (8th Cir.1976); *United States v. Margiotta*, 688 F.2d 108, 139–40 (2d Cir.1982) (Winter, J., concurring and dissenting); cf. *United States v. Goodman*, 984 F.2d 235, 239 and n. 7 (8th Cir.1993). Since it is a purely criminal statute, unlike statutes such as the Sherman Act that authorize both civil and criminal remedies and are interpreted more liberally in cases where only the former are sought, *United States v. United States Gypsum Co.*, 438 U.S. 422, 436–43, 98 S.Ct. 2864, 2873–76, 57 L.Ed.2d 854 (1978), if a narrow interpretation is appropriate to meet the concern with breadth and vagueness it would have to apply to the invocation of the statute in this civil suit.

Consistent with this concern, recent cases, at least, make clear that all the statute punishes is *deliberate* fraud, *United States v. Dunn*, 961 F.2d 648, 650 (7th Cir.1992); *United States v. Stewart*, 872 F.2d 957, 959 (10th Cir.1989), where in order to get money or something else of monetizable value from someone you make a statement to him that you know to be false, or a half truth that you know to be misleading, expecting him to act upon it to your benefit and his detriment. *Midwest Commerce Banking Co. v. Elkhart City Centre*, 4 F.3d 521, 524 (7th Cir.1993); *Rubinstein v. Collins*, 20 F.3d 160, 172 n. 53 (5th Cir.1994). We emphasize the "half truth" half of this definition. *United States v. Keplinger*, 776 F.2d 678, 697 (7th Cir. 1985), holds "that omissions or concealment of material information can constitute fraud

... cognizable under the mail fraud statute, without proof of a duty to disclose the information pursuant to a specific statute or regulation." In that case a laboratory had omitted from a report on the toxicity of a drug an opinion by a consultant that the drug had some toxic effects, and we held that the jury was entitled to find that this omission was fraudulent, given the impression, conveyed by the report, of the utter harmlessness of the drug. Plenty of cases say that "merely failure to disclose" is not, without more, mail fraud, e.g., *Reynolds v. East Dyer Development Co.*, 882 F.2d 1249, 1252 (7th Cir.1989), and we certainly have no quarrel with this proposition. Whether a failure to disclose is fraudulent depends on context, *United States v. Biesiadecki*, 933 F.2d 539, 542–43 (7th Cir.1991), to which we now turn.

■ We do not of course know the state of mind of the employees of American General Finance who drafted the letter to Emery and its other customers; nor can the plaintiff have more than an inkling until she has an opportunity to conduct pretrial discovery. But assume, as the complaint adequately invites us to do, that these employees, desiring to exploit the financial naiveté of working-class borrowers, realizing that these borrowers do not read Truth in Lending Act disclosure forms intelligently, and hoping to trick them into overpaying disastrously for credit, drafted a letter that they believed would be effective in concealing the costs of refinancing. Read against this background of nefarious purpose, the letter is seen to be replete with falsehoods and half truths. "Dear Verna ... You're a good customer. To thank you for your business, I've set aside $750.00* in your name." She is no "Dear Verna" to them; she has not been selected to receive the letter because she is a good customer, but because she belongs to a class of probably gullible customers for credit; the purpose of offering her more money is not to thank her for her business but to rip her off; nothing has been "set aside" for her. "[W]e could write your check on the spot. Or, call ahead and I'll have the check waiting for you." Yes—along with a few forms to sign whereby for only $1,200 payable over three years at an even higher monthly rate than your present loan (and than your present

loan plus a separate loan for $200, which we could have made you), you can have a meager $200 now. We were not reassured when at the oral argument American General Finance's lawyer was unable to tell us what it cost Verna Emery to obtain the $200 through a refinancing compared to what it would have cost her had the company simply made her a separate loan for that amount.

■ The district court thought the scheme saved from illegality by the plaintiff's failure to allege either a violation of the Truth in Lending Act or a fiduciary relationship between the finance company and her. The points turn out to be related. A careful reader, comparing the Truth in Lending Act disclosure forms for the original loan to Emery and the refinancing-plus-additional-advance loan, would notice that the monthly payment was almost $20 a month higher under the second loan and by comparing the dates of the two forms would also realize that the second loan would require six more months of payments. But not all persons are capable of being careful readers. Suppose Emery were blind. Or retarded. Would anyone argue that shoving a Truth in Lending Act disclosure form in front of her face would be a defense to fraud? The allegation is that she belongs to a class of borrowers who are not competent interpreters of such forms *and that the defendant knows this and sought to take advantage of it.* Taking advantage of the vulnerable is a leitmotif of fraud. *United States v. Newman*, 965 F.2d 206, 211 (7th Cir.1992). Competent people can protect themselves well enough against most forms of fraud. The incompetent are for that reason a frequent target of con men and other defrauders, and such targeting is, of course, unlawful, and indeed earns the criminal a longer sentence. *Id.* at 211; *United States v. Sutherland*, 955 F.2d 25, 26 (7th Cir.1992); *United States v. Leonard*, 61 F.3d 1181, 1188 (5th Cir.1995).

■ The district court acknowledged that if the finance company had had a fiduciary relationship with Verna Emery, it would have been guilty of fraud had it failed to disclose so material a fact as that refinancing would be a much more costly method of

borrowing another $200 than borrowing it in a separate loan. A fiduciary must be as honest with the persons to whom he stands in a fiduciary relationship as he would want other people to be with him. *Charter Oak Fire Ins. Co. v. Color Converting Industries Co.*, 45 F.3d 1170, 1175–76 (7th Cir.1995); *Burdett v. Miller*, 957 F.2d 1375, 1381 (7th Cir.1992). But it is not true that if you are not a fiduciary anything goes, short of false statements. A half truth, or what is usually the same thing a misleading omission, is actionable as fraud, including mail fraud if the mails are used to further it, if it is intended to induce a false belief and resulting action to the advantage of the misleader and the disadvantage of the misled. This is adequately alleged in the complaint.

We do not hold that "loan flipping" is fraud, because the boundaries of the term are obscure. We do not hold that American General Finance engaged in fraud, or even in "loan flipping." We do not hold that the mail fraud statute criminalizes sleazy sales tactics, which abound in a free commercial society. State of mind is crucial in a case of criminal fraud, as we have emphasized, and there is no evidence as yet concerning the state of mind of the defendant's relevant employees. We have no idea who composed the letter to Verna Emery or what the author had in mind when he composed it. All we know is that the allegations of fraud are sufficient to withstand a motion to dismiss the complaint for failure to state a claim. There is a state of facts consistent with the complaint that if proved would establish a violation of the mail fraud statute, and no more is required at this stage for the suit to continue. E.g., *H.J. Inc. v. Northwestern Bell Tel. Co.*, 492 U.S. 229, 249–50, 109 S.Ct. 2893, 2905–06, 106 L.Ed.2d 195 (1989).

The defendant, however, advanced, and the plaintiff in her reply brief contested, several alternative grounds for upholding the dismissal of the suit. One of them is plainly meritorious. To prevail in a RICO case, the plaintiff must prove a "pattern of racketeering" consisting of at least two separate criminal acts. Where the acts are acts of fraud, the circumstances of each act must be pleaded with particularity. Fed. R.Civ.P. 9(b); *Graue Mill Development Corp. v. Colonial Bank & Trust Co.*, 927 F.2d 988, 992 (7th Cir.1991); *Lancaster Community Hospital v. Antelope Valley Hospital District*, 940 F.2d 397, 405 (9th Cir.1991); *New England Data Services, Inc. v. Becher*, 829 F.2d 286, 290 (1st Cir.1987). The plaintiff pleaded with adequate particularity the fraud directed against her, but with regard to other customers of American General Finance alleged merely that the company did the same thing to them. There are no names or dates or other details of transactions involving any other customer besides Emery. These details would not be necessary to identify additional members of the plaintiff's class, but are necessary to identify a violation of RICO, which requires (in this case) more than one fraud and only one is alleged to have been perpetrated against Emery herself.

The district judge was therefore right to dismiss the complaint. But had he done so on the basis of Rule 9(b), he would of course have given Emery a chance to amend her complaint to cure what appears to be a merely technical pleading deficiency. *Devaney v. Chester*, 813 F.2d 566, 569 (2d Cir. 1987); *Schreiber Distributing Co. v. Serv-Well Furniture Co.*, 806 F.2d 1393, 1401–02 (9th Cir.1986). The dismissal of the suit, as distinct from the complaint, was therefore premature, unless the defendant's other grounds for affirming the judgment have merit. But as they are complicated, and the district judge has not considered them, we leave them for his consideration on remand.

REVERSED AND REMANDED.

COFFEY, Circuit Judge, dissenting.

It is a truth at least as old as the Bible that "the borrower is servant to the lender." *Proverbs* 22:7. Polonius recognized this when he advised Laertes:

Neither a borrower nor a lender be; For loan oft loses both itself and friend, And borrowing dulleth th' edge of husbandry.

*Hamlet*, Act I, scene iii, line 75 (Riverside Shakespeare). For whatever reason, Verna Emery did not heed this wisdom and, in the words of the majority, she ended up "over-

paying disastrously for credit." Emery then brought a suit under civil RICO, claiming that American General Finance, Inc. ("AGF") engaged in a pattern of racketeering activity, i.e., acts of "loan-flipping" that allegedly constitute mail fraud pursuant to 18 U.S.C. § 1341. The majority concludes that it was improper for the district court to dismiss Emery's suit on a 12(b)(6) motion. I am unable to join in this conclusion and therefore respectfully dissent.

## ANALYSIS

In addressing any civil RICO claim, it is worthwhile to consider both the original purposes of the RICO statute[1] and the way in which RICO operates in tandem with other statutes:

> Congress enacted RICO in an attempt to eradicate organized, long-term criminal activity. To that end, Congress chose to supplement criminal enforcement of its provisions with a civil cause of action for persons whose business or property has been injured by such criminal activity. To encourage private enforcement, Congress provided civil RICO plaintiffs with the opportunity to recover treble damages, costs, and attorney's fees if they can successfully establish the elements of a RICO violation by a preponderance of the evidence. The elements of a RICO violation consist of '(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity.' A

pattern of racketeering activity consists of at least two predicate acts of racketeering committed within a ten-year period. Predicate acts are acts indictable under a specified list of criminal laws, including mail fraud under 18 U.S.C. § 1341, and wire fraud under 18 U.S.C. § 1343.

*Midwest Grinding Co. v. Spitz*, 976 F.2d 1016, 1019 (7th Cir.1992) (internal citations omitted).

The elements of mail fraud under 18 U.S.C. § 1341 are: "(1) the defendant's participation in a scheme to defraud; (2) defendant's commission of the act with intent to defraud; and (3) use of the mails in furtherance of the fraudulent scheme." *United States v. Walker*, 9 F.3d 1245, 1249 (7th Cir.1993), *cert. denied*, —— U.S. ——, 114 S.Ct. 1863, 128 L.Ed.2d 485 (1994). The district court, pursuant to Rule 12(b)(6), dismissed Emery's civil RICO claim because it failed to state a claim for mail fraud.[2] The district court was troubled by the plaintiff's failure to "identify any specific false statement of material fact allegedly made by the defendant" and concluded, in light of AGF's compliance with state and federal consumer lending laws, that Emery could not establish a "scheme to defraud" within the meaning of 18 U.S.C. § 1341. *Emery v. American General Finance*, 873 F.Supp. 1116, 1120 (N.D.Ill.1994).

---

1. I am well aware that we have strayed a good distance from the original intent behind the RICO statute, which was to combat organized crime, and that the Supreme Court has to some extent validated this trend. *See, e.g. Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 105 S.Ct. 3275, 87 L.Ed.2d 346 (1985) (RICO applies to legitimate businesses); *National Organization for Women v. Scheidler*, —— U.S. ——, 114 S.Ct. 798, 127 L.Ed.2d 99 (1994) (RICO does not require proof of an economic motive). Nevertheless, the Supreme Court has also made it clear that RICO's "liberal construction" clause (see note following 18 U.S.C. § 1961) is not a blank check for those who wish to advance novel interpretations of the statute. *Reves v. Ernst & Young*, 507 U.S. 170, 113 S.Ct. 1163, 1172, 122 L.Ed.2d 525 (1993). I believe it is important to resist further expansion of civil RICO through liberal interpretation of either RICO itself or of the various "predicate act" statutes, such as the mail fraud statute.

2. At the district court level, AGF offered additional arguments in favor of dismissal. These arguments centered on Emery's alleged failure to establish the elements, not of mail fraud, but of RICO itself. AGF argued that (1) Emery failed to allege sufficiently that AGF, as a RICO "person," conducted or participated in the affairs of a RICO "enterprise," and (2) Emery failed to allege sufficiently that a RICO violation was the proximate cause of any injury. Admittedly, these arguments are complicated, and the district judge did not address them. Nevertheless, this court may affirm a dismissal on any ground supported by the record. *Vicom, Inc. v. Harbridge Merchant Servs., Inc.*, 20 F.3d 771, 778 (7th Cir.1994). I think it is unfortunate that the majority chooses not to consider these arguments, which may have merit. As Judge Cudahy once observed, "RICO is a judge's nightmare and doggedly persistent efforts to hammer it into a rational shape deserve the utmost respect even though they can rarely accomplish the impossible." *Id.* at 785 (Cudahy, J., concurring).

The gist of Emery's complaint is not that AGF outright lied to her; she cannot make such a claim because the flier distributed to her (quoted at length in the majority opinion) contained no false statements or affirmative misrepresentations. Rather, Emery argues that AGF omitted or failed to disclose material information (specifically, the fact that refinancing her existing loan would be more costly than obtaining a new loan). "Indeed," as the district court observed, "plaintiff's entire case is premised upon defendant's failure to volunteer the fact that a second loan would be cheaper than a refinancing of the first loan." *Id.*

The majority, citing *United States v. Keplinger,* 776 F.2d 678, 697 (7th Cir.1985), asserts that an omission or a non-disclosure *can sometimes amount to fraud* within the meaning of the mail fraud statute, even "without proof of a duty to disclose the information pursuant to a specific statute or regulation." Maj.Op. at 1347. In *Keplinger,* this court borrowed language evidently first used by the Fifth Circuit stating that "the measure of fraud is its departure from moral uprightness, fundamental honesty, fair play and candid dealings in the general life of members of society." 776 F.2d at 698; *see Gregory v. United States,* 253 F.2d 104, 109 (5th Cir.1958). However, subsequent to our decision in *Keplinger,* this court "repented" of our earlier infatuation with such broad language, calling it "hyperbole." *Matter of EDC, Inc.,* 930 F.2d 1275, 1281 (7th Cir. 1991). In an opinion authored by Chief Judge Posner, this court *explicitly warned against "extravagant rhetoric ... interpreting the federal mail fraud ... statute*[ ]." *Id.* (emphasis added). "Read literally," we cautioned, the " 'fair play' theory of mail and wire fraud" would *"put federal judges in the business of creating new crimes; federal criminal law would be the nation's moral vanguard." Id.* (emphasis added); *see also United States v. Holzer,* 816 F.2d 304, 309 (7th Cir.1987), *cert. granted and judgment vacated on other grounds,* 484 U.S. 807, 108 S.Ct. 53, 98 L.Ed.2d 18 (1987) ('moral uprightness' standard "is much too broad" and "cannot ... be taken literally."). Our cases thus make clear that the mail fraud statute does not codify a strict code of honor in business dealings, but rather targets only conduct that is widely recognized as fraudulent. *See Holzer,* 816 F.2d at 309; *United States v. Dial,* 757 F.2d 163, 170 (7th Cir. 1985), *cert. denied,* 474 U.S. 838, 106 S.Ct. 116, 88 L.Ed.2d 95 (1985).

Since *Keplinger,* this court has also clarified that "mere failure to disclose, *absent something more,"* does not constitute mail fraud, notwithstanding the broad language used in *Keplinger* and a handful of other cases. *Reynolds v. East Dyer Development Co.,* 882 F.2d 1249, 1252 (7th Cir.1989) (emphasis added). The cases in which this court has held that "non-disclosure" may be deemed fraudulent all involved a special circumstance of some kind. *See, e.g., Dial,* 757 F.2d at 170 (defendant, a fiduciary, engaged in "elaborate efforts at concealment"); *Holzer,* 816 F.2d at 309 (defendant, a public official, engaged in "systematic" receipt of bribes "coupled with active efforts [at concealment]"); *Keplinger,* 776 F.2d at 699 (omission could properly be considered part of a scheme to defraud where defendant engaged in "a wide variety of deceptive actions").

There were no such special circumstances in this case. AGF, as Emery's creditor, was not a fiduciary. *See McErlean v. Union Nat'l Bank of Chicago,* 90 Ill.App.3d 1141, 46 Ill.Dec. 406, 412, 414 N.E.2d 128, 134 (1980). AGF did not engage in a "wide variety of deceptive actions," nor can its conduct vis-á-vis Emery be fairly described as an "elaborate attempt at concealment."

Defeating all of the potential arguments available to Emery is a simple and uncontroverted fact: AGF fully complied with the disclosure requirements of both the federal Truth in Lending Act ("TILA"), 15 U.S.C. § 1601 *et seq.,* and the Illinois Consumer Installment Loan Act ("CILA"), 205 ILCS 670/1 *et seq.* Before Emery agreed to refinance her loan, AGF disclosed to her the following information, as required by law: (1) the exact amount necessary to pay off the existing loan, (2) the amount financed, (3) the finance charge, (4) the annual percentage rate, (5) the total of payments, and (6) the amount of the monthly payments.

My colleagues do not think that AGF's compliance with these statutes is especially significant. The majority calculates that the implicit interest rate paid by Emery for a loan of just $200 exceeded 110 percent per annum and notes that TILA does not require disclosure of this fact because the Act treats the transaction as reborrowing the original amount of the loan plus $200. "So much for the Truth in Lending Act as a protection for borrowers," the majority editorializes. The consumer lending statutes passed by Congress and by the Illinois legislature may well be inadequate for failing to require explicit disclosure of the disadvantages of refinancing versus taking out a new loan.[3] If this is true, however, any remedy lies with Congress or with the state legislature, not with a federal court. "It is the duty of the legislative branch to make the law" and we, as federal appellate judges, should "refuse[ ] to infringe on the legislative prerogative of enacting statutes to implement public policy." *Welsh v. Boy Scouts of America,* 993 F.2d 1267, 1270 (7th Cir.1993), *cert. denied,* — U.S. ——, 114 S.Ct. 602, 126 L.Ed.2d 567 (1993) (quotation omitted). As Justice Cardozo once observed: "We do not pause to consider whether a statute differently conceived and framed would yield results more consonant with fairness and reason. We take the statute as we find it." *Anderson v. Wilson,* 289 U.S. 20, 27, 53 S.Ct. 417, 420, 77 L.Ed. 1004 (1933).

In addition to criticizing TILA, the majority also makes much of the "financial naiveté of working-class borrowers." Emery, we are told, belongs to a "class of probably gullible customers for credit." Lack of financial acumen, according to the majority, is much like blindness or mental retardation because it renders one vulnerable to "con men and defrauders."[4] By enacting TILA, however, Congress has provided all the protection it deems appropriate for borrowers, be they financially astute or ill-informed and gullible. Moreover, notwithstanding the majority's cri-

tique of TILA, the legislation *does* offer extensive protection to borrowers by requiring disclosures that are easy to comprehend "so that the consumer will be able to compare more readily the various credit terms available to him and avoid the uninformed use of credit." 15 U.S.C. § 1601(a). It appears from the record before us that Verna Emery is a fully capable adult citizen suffering from no physical or mental disabilities, such as blindness, deafness, or mental incapacity. I am therefore unable to see the relevance of her susceptibility to business practices which, although arguably manipulative and unethical, fully complied with the law.

I do not condone AGF's practices, nor am I unsympathetic to Emery's plight. The conduct in the factual record before us may very well have been improper, but it violated neither statute nor case law. As a distinguished colleague on the Ninth Circuit once observed, "courts do not sit to compensate the luckless; this is not Sherwood Forest." *Kern v. Levolor Lorentzen,* 899 F.2d 772, 798 (9th Cir. 1990) (Kozinski, J., dissenting). I must insist, as this court has in the past, that "[n]ot all conduct that strikes a court as sharp dealing or unethical conduct is a 'scheme or artifice to defraud'" within the meaning of the federal mail fraud statute. *Reynolds,* 882 F.2d at 1252; *see also Dial,* 757 F.2d at 170.

Emery offers a broad definition of what constitutes fraudulent conduct. Under this definition, which the majority appears to accept, any number of "half-truths" and omissions that lead people to part with their hard-earned cash could be prosecuted under the federal mail fraud statute, even when no special circumstances accompany the alleged non-disclosure. This definition of fraud potentially encompasses a vast range of questionable activity. To use an example cited at oral argument, it would criminalize numerous direct-mail solicitations informing recipients that they have "won the lottery," or that a

---

3. At oral argument, counsel for Emery was unable to shed light on whether Congress has been apprised of the alleged shortcomings of the TILA statute, or whether Congress has ever considered amending the statute to address the issue of "loan-flipping."

4. Emery does not allege that she is either blind or mentally retarded. In any case, persons who suffer from such disabilities generally conduct their financial affairs with assistance of some kind, often provided by a fiduciary.

"special cash prize" is reserved for them.[5] Partly because the "use of the mails" requirement is so easily met, this court has (in the past) eschewed sweeping interpretations of what constitutes fraudulent conduct under the mail fraud statute. *Holzer*, 816 F.2d at 309. This conservative approach guarantees that "federal judges [will not be] in the business of creating what in effect would be common law crimes, i.e., crimes not defined by statute." *Id.*

## CONCLUSION

I am somewhat heartened by the limited nature of the majority's holding. Wisely, my colleagues refuse to hold that "loan-flipping" is fraud, or that AGF engaged in fraud in this case. The majority also denies any intention to "criminalize[ ] sleazy sales tactics, which abound in a free commercial society." Maj.Op. at 1348. Nevertheless, the majority does hold that it was premature for the district court to dismiss the suit. I disagree. In light of AGF's compliance with TILA and the Illinois consumer lending statute, I do not believe that Emery will *ever* be able to establish a "scheme or artifice to defraud," much less "an elaborate attempt at concealment." AGF's full compliance with the applicable disclosure requirements, and the absence of any special circumstance that would render AGF's non-disclosure fraudulent, bar any possible claim under the mail fraud statute, and thus, under RICO. The district court's dismissal of Emery's lawsuit under 12(b)(6) was proper because it appeared that Emery could "prove no set of facts in support of [her] claim which would entitle [her] to relief." *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957) (interpreting Rule 12(b)(6)). Remanding the case for further proceedings at this juncture is, in my opinion, both unnecessary and a waste of judicial resources. The majority's holding sends the wrong message to district judges, who are trying desperately to manage their dockets in the face of mounting civil litigation, and will only encourage further lawsuits based on novel and expansive readings of the

mail fraud statute and of RICO. For these reasons, I respectfully dissent from the majority.

---

5. Similarly, the definition of fraud urged by Emery could extend, under the wire fraud statute, 18 U.S.C. § 1343, to many advertisements on

late-night television, which tout the benefits of telephone psychics, miracle vitamins, and the like.