Bradley C. HASTINGS and Kimberly L. Hastings, on behalf of themselves and all others similarly situated, Plaintiffs,

v.

FIDELITY MORTGAGE DECISIONS CORP., Robert K. Meriweather, and John Does 1–10, Defendants.

No. 97 C 3560.

United States District Court, N.D. Illinois, Eastern Division.

Oct. 15, 1997.

Cathleen M. Combs, Daniel A. Edelman, James O. Latturner, Tara Leigh Goodwin, Edelman & Combs, Chicago, IL, Edward K. O'Brien, O'Brien Law Firm, P.C., Nashua, NH, for Plaintiffs.

James M. Breen, Dianne E. Rist, Jamie Goldman Zelvin, Chapman & Cutler, Chicago, IL, for Defendants.

## MEMORANDUM OPINION AND ORDER

ASPEN, Chief Judge.

Plaintiffs Bradley and Kimberly Hastings ("the Hastings") brought a seven count Complaint against Fidelity Mortgage Decisions Corporation ("Fidelity"), Robert Meriweather, Fidelity's President, and John Does 1–10, who are unidentified corporate officers and managers of Fidelity. The defendants have moved to strike the John Doe defendants and

to dismiss the Complaint.[1] For the reasons set forth below, the motion to strike is denied and the motion to dismiss is granted in part and denied in part.

## I. Background

In August 1996, the Hastings sought to refinance their New Mexico residence. They hired the Superior Mortgage Company ("Superior") to help them obtain a mortgage loan and agreed to pay Superior a $2,800 "mortgage broker" fee. Compl. ¶ 21. Superior represented that it would shop around and obtain the best possible interest rate for the Hastings, which it initially thought might be an adjustable rate mortgage starting at 6.5% with a cap of 11%. *See id.* ¶¶ 22, 24. Later that month, Superior arranged a loan for the Hastings with Fidelity. *See id.* ¶ 25. Fidelity's proposal differed significantly from Superior's initial estimate in that it specified a fixed interest rate of 10.48%. *See id.* ¶ 26.

When the Hastings arrived at the scheduled closing on September 13, 1996, they were disturbed by the unexpectedly high rate of interest, as well as by the inclusion of a $4,200 "loan discount" fee of which they were previously unaware. *Id.* ¶ 28. The Hastings refused to close on the loan that day, and Mr. Hastings contacted Superior to inquire about these unanticipated changes. *See id.* ¶¶ 28, 30. John Snyder, Superior's President, indicated to Mr. Hastings that he would either "take care" of the $4,200 or pay it out of his own pocket. *Id.* ¶ 28. Accordingly, the Hastings attended a second closing on September 16, which was completed successfully. *See id.* ¶ 31. The terms of the new agreement provided for a fixed interest rate of 12.5%, but there was no "loan discount" fee charged to the Hastings. *Id.* The forms indicate, however, that Fidelity paid a $4,200 "broker premium" fee to Superior pursuant to the transaction.[2] *Id.* ¶ 34 & Ex. C.

Neither Fidelity nor Superior ever explained to the Hastings the meaning of the "broker premium fee" paid by Fidelity to Superior, and the Hastings now allege that this fee was paid by Fidelity as a reward to Superior for closing the loan at an above-market interest rate. *Id.* ¶¶ 35–37. The Hastings contend that, given their good credit rating and high equity in their home, they could have obtained a mortgage loan at a lower interest rate if Fidelity and Superior had not secretly agreed to artificially inflate their rate and then divide the spoils between themselves. *See id.* ¶¶ 37, 40. The Hastings believe it is the policy and practice of Fidelity to make payments to mortgage brokers in return for referrals of loans at above-market rates of interest. *See id.* ¶¶ 11–13.

## II. Motion to Dismiss Standard

Dismissal under Rule 12(b)(6) of the Federal Rules of Civil Procedure is improper "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957). For purposes of this motion, we take all of the well-pleaded factual allegations in the complaint as true, construe them in the light most favorable to the plaintiffs, and draw reasonable inferences on the plaintiffs' behalf. *See Lanigan v. Village of E. Hazel Crest,* 110 F.3d 467, 468 (7th Cir.1997); *Richmond v. Nationwide Cassel L.P.,* 52 F.3d 640, 644 (7th Cir.1995).

## III. Discussion

The Hastings' Complaint alleges that Fidelity's conduct: (1) violated the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962(c) (Counts I and II); (2) violated the Real Estate Settlement Procedures Act ("RESPA"), 12 U.S.C. § 2607 (Counts III and IV); (3) constituted an intentional interference with contract (Count V); (4) induced a breach of fiduciary duty by Superior (Count VI); and (5) violat-

---

**1.** The Hastings responded to Fidelity's motion to dismiss by filing an Amended Complaint. Our references, therefore, are to the Amended Complaint.

**2.** The Complaint indicates that the payment that Fidelity refers to as a "broker premium fee" is often referred to as a "yield spread premium."

Compl. ¶ 11. These interchangeable terms both describe a payment made to a mortgage broker by a lender to reward the broker for negotiating a loan at an above-market rate of interest. *See generally Culpepper v. Inland Mortgage Corp.,* 953 F.Supp. 367, 370 (N.D.Ala.1997) (discussing yield spread premiums).

ed the Illinois Consumer Fraud Act ("ICFA"), 815 ILCS 505/2, and the New Mexico Deceptive Trade Practices Act, N.M.Stat.Ann. § 57–12–2D (Count VII). In addition to Fidelity itself, the Hastings have named as defendants Fidelity's President, Robert Meriweather, and "John Does 1–10," whom the Complaint identifies as unknown "corporate officers or managers of Fidelity." Compl. ¶¶ 7–8. Fidelity has moved to strike the claims against the John Does [3] and has challenged each of the six theories of liability proposed by the plaintiffs. We discuss each argument in turn.

### A. John Doe Defendants

 There is no general prohibition against plaintiffs bringing claims against parties whose specific identities are unknown. *See, e.g., Bivens v. Six Unknown Named Agents of Fed. Bur. of Narcotics,* 403 U.S. 388, 390 n. 2, 91 S.Ct. 1999, 2001 n. 2, 29 L.Ed.2d 619 (1971) (permitting a suit to go forward even though the defendant agents were not named in the complaint). The Federal Rules of Civil Procedure, however, impose a practical limitation on this practice: pleadings must be sufficiently detailed so as to provide notice to opposing parties of the claims against them. *See Vicom v. Harbridge Merchant Servs., Inc.,* 20 F.3d 771, 775 (7th Cir.1994); 5 CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE & PROCEDURE § 1215 (2d ed.1990). In light of this principle, an action may proceed against a party whose name is unknown only "if the complaint makes allegations specific enough to permit the identity of the party to be ascertained through reasonable discovery." *Estate of Rosenberg v. Crandell,* 56 F.3d 35, 37 (8th Cir.1995). In this case, the John Doe defendants are identified as "corporate officers or managers of Fidelity who are personally knowledgeable and responsible for the fraudulent practices described [in the Complaint]." Compl. ¶ 8. We think this descrip-

tion is sufficiently specific to satisfy the basic pleading of requirements of Federal Rule 8(a), and we therefore deny Fidelity's motion to strike the John Does from the Complaint.

### B. RICO

In order to state a RICO claim, a plaintiff must show: " '(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity.' " *Richmond,* 52 F.3d at 644 (quoting *Sedima, S.P.R.L. v. Imrex Co.,* 473 U.S. 479, 496, 105 S.Ct. 3275, 3285, 87 L.Ed.2d 346 (1985)). The conduct in question must be perpetrated by a "person" who is distinct from the "enterprise." *See id.* at 646–47. Fidelity argues that the Hastings did not adequately allege any of these elements.

#### 1. Racketeering Activity

RICO defines "racketeering activity" as any act indictable under certain specified federal statutes. 18 U.S.C. § 1961(1)(B); *see also Reynolds v. East Dyer Dev. Co.,* 882 F.2d 1249, 1251 (7th Cir.1989). A RICO plaintiff must allege that the defendant violated at least one of the enumerated statutes—such offenses are known as "predicate acts." The Hastings suggest that the defendants committed two predicate acts: commercial bribery in violation of the Travel Act, 18 U.S.C. § 1952, and mail fraud in violation of 18 U.S.C. § 1341.[4] *See* Compl. ¶ 50. Fidelity contends that neither has been sufficiently plead.

#### a. Travel Act

 The Hastings allege that the defendants violated the Travel Act, which prohibits "travel[ ] in interstate or foreign commerce or use[ ] of the mail ... with intent to (1) distribute the proceeds of any unlawful activity; or ... (3) otherwise promote, manage, establish, [or] carry on ... any unlawful activity." 18 U.S.C. § 1952(a)(1), (3). "Un-

---

**3.** Fidelity's original motion challenged the claims against Robert Meriweather on the ground that the Complaint did not contain sufficient factual allegations regarding his conduct. In light of the new allegations in the Amended Complaint, *see* Compl. ¶¶ 72, 74, Fidelity appears to have abandoned this argument—the Reply brief does not mention it.

**4.** The Hastings also allege that the defendants violated the wire fraud statute, 18 U.S.C. § 1343. Since there is no material difference between the mail and wire fraud allegations in this case, for the sake of simplicity we refer only to mail fraud in the text of this opinion.

lawful activity" is a term of art, which the statute defines as including "extortion, bribery, or arson in violation of the laws of the State in which committed . . . ." 18 U.S.C. § 1952(b). The Hastings suggest that the defendants engaged in the requisite "unlawful activity" by violating Illinois's commercial bribery statute, which states: "A person commits commercial bribery when he confers . . . any benefit upon any employee, agent, or fiduciary without the consent of the latter's employer or principal, with intent to influence his conduct in relation to his employer's or principal's affairs." 720 ILCS 5/29A–1.

Fidelity clearly conferred a benefit on Superior (the yield spread premium payment), and arguably did so without the consent of the Hastings, which brings us to a question critical to several of the claims in this case: have the Hastings adequately alleged that Superior was their "agent?" [5] Two courts in this district have denied dispositive motions challenging allegations of agency very similar to those presented here. *See Johnson v. Rohr–Ville Motors, Inc.,* No. 95 C 1032, 1996 WL 447261 (N.D.Ill. Aug.2, 1996); *Fairman v. Schaumburg Toyota, Inc.,* No. 94 C 5745, 1996 WL 392224 (N.D.Ill. July 10, 1996). In *Fairman,* for example, the defendant was an auto dealer who had promised to obtain the best loan terms available for the plaintiff, who had purchased one of its cars. *See Fairman,* 1996 WL 392224, at *1. The plaintiff alleged that this promise created an agency relationship and that the dealer had breached its agency duties by arranging a loan with an inflated interest rate in order to obtain a secret kick-back from the lender. *See id.* at *1–2. The court found these allegations sufficient to permit the plaintiff's theory of agency liability to survive a motion to dismiss. *See id.* at *4–5; *see also Johnson,*

1996 WL 447261, at *6 (denying a motion for summary judgment).

■ Both *Johnson* and *Fairman* resolve the agency question with little discussion,[6] but we believe it to be a difficult one. An agency relationship has two components: "(1) the principal has the right to control the manner and method in which the agent performs the work for her, and (2) the agent has the power to subject the principal to personal liability." *Peterson v. H & R Block Tax Servs., Inc.,* 971 F.Supp. 1204, 1213 (N.D.Ill. 1997); *see also Knapp v. Hill,* 276 Ill.App.3d 376, 212 Ill.Dec. 723, 726, 657 N.E.2d 1068, 1071 (1995); RESTATEMENT (SECOND) OF AGENCY §§ 1 (1957); *id.* § 12 (stating that an agent "holds a power to alter the legal relations between the principal and third persons"). The facts alleged in the Complaint do not firmly establish either of these elements. First, there is no clear indication that the Hastings retained any ability to control the "manner and method" by which Superior would obtain their loan; one reading of the Complaint suggests that they simply asked Superior to get them the best loan available and then left them to achieve this goal by whatever means Superior thought prudent. *See* Compl. ¶ 22. On the other hand, the Hastings' request that Superior negotiate for better terms after they rejected Fidelity's first offer might be indicative of some degree of control. *See id.* ¶ 28.

Second, it is not clear whether Superior had the power to affect the legal rights or obligations of the Hastings. Once Superior identified Fidelity as the best prospective lender, Fidelity dealt directly with the Hastings. *See* Compl. ¶ 26. The Hastings exercised their own authority by refusing to accept Fidelity's initial offer, *see id.* ¶ 28, and

---

5. The Hastings do not suggest that Superior qualifies as a "fiduciary" except insofar as it attains this status as a result of being an agent. *Cf.* RESTATEMENT (SECOND) OF AGENCY § 13 (1957) (indicating that agents are fiduciaries with respect to matters within the scope of the agency).

6. Both cases contain an unexplained citation to *Allabastro v. Cummins,* 90 Ill.App.3d 394, 45 Ill.Dec. 753, 413 N.E.2d 86 (1980), but we agree with the defendants that *Allabastro* is factually distinguishable. In *Allabastro,* the court found that a loan broker was an agent of the borrower,

but did so based on the fact that the parties had executed a written agency agreement which provided that the borrower would deal exclusively through the broker. *See Allabastro,* 45 Ill.Dec. at 755, 413 N.E.2d at 88. This is a much easier case than ours, since the written agreement clearly establishes what the parties understood their respective rights and responsibilities to be. It is also a much easier case than *Johnson* or *Fairman,* since neither involved a written, exclusive agency agreement.

by subsequently accepting the second, *see id.* ¶ 33. The facts of this case seem at least equally consistent with the view that Superior was merely providing a service for a fee, as with the view that it was acting as an agent for a principal. If this set of facts were presented to us at the summary judgment stage, we would be inclined to grant judgment for the defendants. But given the generosity with which Rule 12 requires us to view complaints, we believe it prudent to follow the lead of the *Fairman* court and permit the plaintiffs to conduct discovery on their agency theory. *Cf.* RESTATEMENT (SECOND) OF AGENCY § 1 (1957) (whether an agency is created "depends upon the existence of required factual elements: the manifestation by the principal that the agent shall act for him, the agent's acceptance of the undertaking and the understanding of the parties that the principal is to be in control of the undertaking"). Once a full factual record is developed it will be easier to determine if the Hastings had the necessary degree of control and if Superior had the power to affect their legal rights.

In sum, we believe that the plaintiffs have adequately (though barely) alleged that the defendants conferred a benefit upon their agent without their consent and with the intent to influence their agent's conduct toward them, and this states a claim under the Illinois commercial bribery statute. This claim serves as a predicate for a violation of the Travel Act, which in turn serves as a predicate for RICO. Accordingly, we decline to dismiss the Hastings' RICO count.

#### b. *Mail Fraud*

##### i. *Rule 9(b)*

 The other predicate act alleged by the Hastings is mail fraud. As a preliminary matter, the defendants argue that the Hastings' allegations do not satisfy Rule 9(b), which provides that "[i]n all averments of fraud or mistake, the circumstances constituting the fraud or mistake shall be stated with particularity." FED.R.CIV.P. 9(b). In RICO cases based on mail or wire fraud, "the

plaintiff must, within reason, describe the time, place, and content of the mail and wire communications, and it must identify the parties to these communications." *Jepson, Inc. v. Makita Corp.*, 34 F.3d 1321, 1328 (7th Cir.1994); *see also Graue Mill Dev. Corp. v. Colonial Bank & Trust Co.*, 927 F.2d 988, 992 (7th Cir.1991). The allegations must be specific enough to provide the defendants with a general outline of how the alleged fraud scheme operated and of their purported role in the scheme. *See Midwest Grinding Co. v. Spitz*, 976 F.2d 1016, 1020 (7th Cir.1992); *Koulouris v. Estate of Chalmers*, 790 F.Supp. 1372, 1374 (N.D.Ill.1992) (defendants need not be given a "pretrial memorandum containing all the evidentiary support for the plaintiff's case," but only "a brief sketch of how the fraudulent scheme operated, when and how it occurred, and the participants"). In evaluating the sufficiency of the pleadings, we bear in mind the purposes of Rule 9(b): (1) protecting the defendants' reputations; (2) preventing fishing expeditions; and (3) providing adequate notice to the defendants. *See Vicom, Inc. v. Harbridge Merchant Servs., Inc.*, 20 F.3d 771, 777 (7th Cir.1994).

At least with respect to establishing the scheme to defraud,[7] we believe the Complaint in this case satisfies the standard set forth in *Jepson.* The Hastings allege that John Snyder, Superior's President, misrepresented his intention to get them the best rate available at their initial meeting in August 1996. *See* Compl. ¶¶ 21–22. The Complaint also alleges the date and content of several mailings between Fidelity and the Hastings through which the defendants effectuated their scheme to defraud: (1) a "good faith estimate" of the loan terms mailed by Fidelity on August 26 which did not mention any $4,200 fee, Compl. ¶ 26; (2) the first (rejected) loan document, which included a $4,200 fee, presented to the Hastings in Albuquerque on September 13 (though presumably mailed or faxed from Fidelity's office in Illinois shortly before that date), *id.* ¶ 28; (3) a second good faith estimate mailed by Fidelity

---

7. The Complaint lacks sufficient particularity with respect to the "pattern" element of RICO, a

matter we discuss *infra* in Part III.B.2.

on September 13, *id.* ¶ 29; and the second (accepted) loan document, which was presented in Albuquerque on September 16, *id.* ¶ 31. Based on these details as well as those set forth in the *Background* section *supra,* we think the Hastings have provided Fidelity and Meriweather with a rather clear picture of how the alleged fraud scheme operated and of their purported roles in the scheme,[8] *see Midwest Grinding,* 976 F.2d at 1020, and we therefore reject the defendants' motion to dismiss under Rule 9(b).

### ii. Scheme to Defraud

■ To establish a violation of the mail fraud statute, a plaintiff must show "(1) that the defendant participated in a scheme to defraud; and (2) that the defendant caused the mail to be used in furtherance of the scheme." *Spiegel v. Continental Illinois Nat. Bank,* 790 F.2d 638, 646 (7th Cir.1986). The Hastings have clearly alleged that the defendants made use of the mails, *see* Compl. ¶ 47, but the parties disagree about whether they have alleged a "scheme to defraud." Fidelity argues that the Complaint is inadequate because it does not allege that it made any misrepresentations or actionable omissions in its communications with the Hastings. *See* Def.'s Br. at 5–8. This assertion has considerable merit. There is no indication in the Complaint that any of the defendants made any false statements to the Hastings: the only false statement alleged is Superior's representation that it intended to get the Hastings "the best interest rate and terms possible," Compl. ¶ 22, but Superior is not a defendant in this case. Moreover, the Complaint does not suggest that there was a special relationship between the Hastings and the defendants which might render them liable for failing to disclose material information about the transaction. *Cf. Emery v. American Gen. Fin., Inc.,* 71 F.3d 1343, 1347–48 (7th Cir.1995) (indicating that omissions can only be actionable if the context of the transaction indicates a duty to disclose); *Reynolds v. East Dyer Dev. Co.,* 882 F.2d 1249, 1252 (7th Cir.1989) (stating that "mere failure to disclose, absent something more" is not fraud).

■ The problem with the defendants' argument is that they need not have committed fraud themselves in order to be found liable for participating in a scheme to defraud. It is true that *"the scheme* must involve some sort of fraudulent misrepresentations or omissions reasonably calculated to deceive persons of ordinary prudence," *Spiegel,* 790 F.2d at 646 (emphasis added), but it is not necessary for every participant in the scheme to make them. Here, the Complaint alleges that Superior misrepresented its intention to obtain the best possible interest rate for the Hastings, while secretly hoping to be rewarded by Fidelity for persuading the Hastings to agree to a loan at an above-market rate of interest. This is sufficient to allege a scheme to defraud.[9]

■ The remaining question, therefore, is whether the Hastings have alleged that the defendants "participated" in this scheme. Mail fraud plaintiffs cannot simply claim that the defendants participated in transactions that turned out to be fraudulent: they must show that the defendants willfully participated in the scheme with knowledge of its fraudulent nature and with the intent that its illicit

---

**8.** As discussed earlier, the identities of the "John Doe" employee-defendants have yet to be determined. But because the alleged scheme to defraud is described rather clearly, it should be possible to identify during discovery which particular Fidelity's employees were involved in the scheme. Particularly since the identities of these employees is a matter within the exclusive knowledge of the defendants, it would be unfair to dismiss the claims against the John Does at this time. *See Jepson,* 34 F.3d at 1328; *Rohlfing v. Manor Care,* 172 F.R.D. 330, 348 n. 24 (N.D.Ill.1997).

**9.** A theme running through the defendants' arguments is that they should not be held liable

because their payment to Superior was sufficiently disclosed on the HUD–1 settlement form provided to the plaintiffs at closing. *See, e.g.,* Def.'s Reply Br. at 6–7. We think this argument misconstrues the fraudulent scheme alleged by the plaintiffs. The Hastings are alleging that their interest rate was inflated specifically to allow Superior to enrich itself by obtaining a kick-back from Fidelity, and to allow Fidelity to enrich itself through the plaintiffs' higher interest payments. Even assuming *arguendo* that the broker premium fee itself was sufficiently "disclosed" on the HUD–1, the link between this fee and the plaintiffs' interest rate was not.

objectives be achieved. *See United States v. Bailey*, 859 F.2d 1265, 1273 (7th Cir.1988); *United States v. Dick*, 744 F.2d 546, 551 (7th Cir.1984). We believe it can reasonably be inferred from the Complaint that the defendants knew of the fraudulent representations made by Superior and intended to help Superior achieve its objectives. With respect to intent, Fidelity structured its broker premium fees so as to encourage brokers to negotiate loans at above-market interest rates. *See* Compl. ¶¶ 11–12. Fidelity certainly knew that Superior was persuading clients such as the Hastings to accept loans at above-market interest rates; it is possible, therefore, that Fidelity knew that Superior was making misrepresentations in order to induce such acceptance.

█ The Hastings' mail fraud claim might also be viable under a second theory. A long line of cases in this circuit, starting with *United States v. George*, 477 F.2d 508 (7th Cir.1973), establishes that a party who pays an agent to breach its duties to its principal is participating in a scheme to defraud the principal. *See, e.g., United States v. Richman*, 944 F.2d 323, 332–33 (7th Cir. 1991); *Ranke v. United States*, 873 F.2d 1033, 1039 (7th Cir.1989). As discussed *supra*, the Hastings have alleged that Superior was their agent, and the Complaint indicates that Fidelity paid Superior $4,200 as a reward for persuading the Hastings to accept a loan at an above-market rate of interest. An agent has a duty to act solely for the benefit of his principal in matters related to the agency, *see* RESTATEMENT (SECOND) OF AGENCY § 387 (1957), as well as a duty to reveal information relevant to the affairs entrusted to him, *see id.* § 381. Under the facts alleged, Superior appears to have violated both of these duties in order to obtain the reward offered by Fidelity. Thus, the Hastings have adequately stated a claim of mail fraud as a predicate for their RICO claim.

### 2. Pattern

█ The defendants' second challenge to the Hastings' RICO claim is that they have failed to allege a "pattern" of racketeering activity. The statutory definition of "pattern" is not of much assistance: it merely indicates that a pattern "requires at least two acts of racketeering activity." 18 U.S.C. § 1961(5). A more fruitful source of guidance on this question is the Supreme Court's discussion in *H.J. Inc. v. Northwestern Bell Tel. Co.*, 492 U.S. 229, 109 S.Ct. 2893, 106 L.Ed.2d 195 (1989). The Court stated that "to prove a pattern of racketeering activity a plaintiff or prosecutor must show that the racketeering predicates are related, *and* that they amount to or pose a threat of continued criminal activity." *Id.* at 239, 109 S.Ct. at 2900.

█ The Hastings attempt to allege a pattern by asserting that "[i]t is the policy and practice of Fidelity to make payments to mortgage brokers ... similar to the 'broker premium fee' paid in connection with plaintiffs' transaction." Compl. ¶ 12; *see also id.* ¶ 18 (indicating that Fidelity "continuously offered, and routinely paid, these illicit bribes...."). This allegation will suffice insofar as the plaintiffs' RICO claim is predicated on violations of the Travel Act, but "[w]here the [predicate] acts are acts of fraud, the circumstances of each act must be pleaded with particularity." *Emery*, 71 F.3d at 1348 (citing FED.R.CIV.P. 9(b)). In *Emery*, the Seventh Circuit affirmed the dismissal of a RICO claim for failure to allege a pattern where the plaintiff had alleged with particularity the fraud directed at her, but then generally alleged that the defendant had done the same thing to other parties. *See id.* The court observed, however, that plaintiffs whose claims are dismissed under this reasoning should be given a chance to amend their pleadings when they acquire more specific information, *see id.*, which would presumably require at least preliminary discovery. *See Feinstein v. Resolution Trust Corp.*, 942 F.2d 34, 42–43 (1st Cir.1991) (discussing the conditions under which plaintiffs should be allowed discovery to cure particularity problems in their RICO claims). This approach is consistent with the principle that Rule 9(b)'s particularity requirement should be relaxed with respect to details that are within the defendant's exclusive knowledge. *See Jepson*, 34 F.3d at 1328. Accordingly, the Hastings' RICO claim is dismissed insofar as it rests on mail fraud as its predi-

cate act, but they will be given leave to amend their Complaint and reinstate this claim if discovery provides them with facts tending to establish that the defendants engaged in a pattern of mail fraud.

### 3. Enterprise

■ The defendants' final objection to the Hastings' RICO claims is that they fail to allege an "enterprise" as the statute requires. 18 U.S.C. § 1962(c); *see also Richmond*, 52 F.3d at 645 ("A RICO complaint must identify the enterprise."). The statute defines an "enterprise" as any "individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact...." 18 U.S.C. § 1961(4). In elaborating on this statutory term, the Seventh Circuit has characterized an enterprise as an " 'ongoing structure of persons associated through time, joined in purpose, and organized in a manner amenable to hierarchical or consensual decision-making.' " *Richmond*, 52 F.3d at 644 (quoting *Jennings v. Emry*, 910 F.2d 1434, 1440 (7th Cir.1990)). The structure and goals cannot simply be the commission of the predicate acts: RICO plaintiffs must allege there is "an entity separate and apart from the pattern of activity in which it engages." *United States v. Turkette*, 452 U.S. 576, 583, 101 S.Ct. 2524, 2529, 69 L.Ed.2d 246 (1981). In addition, even after an enterprise has been identified, a § 1962(c) plaintiff must also allege that a " 'person' associated with the enterprise conducted or participated, 'directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity.' " *Richmond*, 52 F.3d at 646 (quoting § 1962(c)). The alleged "person" must be distinct from the enterprise itself, *see Haroco v. American Nat'l Bank & Trust Co.*, 747 F.2d 384, 402 (7th Cir.1984), *aff'd*, 473 U.S. 606, 105 S.Ct. 3291, 87 L.Ed.2d 437 (1985), and must participate in the operation or management of the enterprise's affairs, not just its own, *see Reves v. Ernst & Young*, 507 U.S. 170, 184–86, 113 S.Ct. 1163, 1173, 122 L.Ed.2d 525 (1993).

The Hastings allege several different enterprises, *see* Compl. ¶ 44, and we find at least one of them to be sufficient: the associ-

ation of Fidelity and Superior. The Complaint indicates that there is a structure to their relationship: Superior originates loans for Fidelity, which provides the necessary capital. *Id.* ¶ 9. This relationship is alleged to be continuous, *see id.* ¶ 18, which is logical since Superior, as a mortgage broker, needs to have a constant source of capital to provide loans to its clients, and Fidelity needs to have a means of connecting with prospective borrowers. The two companies share a goal of providing loans for customers at a profitable rate of interest (too profitable, according to the Hastings, *see id.* ¶¶ 18–19). The association appears to be amenable to consensual decision-making: Fidelity and Superior must agree on an appropriate broker premium fee for each transaction. The association exists separate and apart from the pattern of racketeering activity alleged in the Complaint, since Fidelity would require the services provided by mortgage brokers such as Superior even if it did not participate in schemes designed to artificially inflate the interest rates charged to borrowers.

Fidelity is a "person" separate from the association-in-fact involving it and Superior, and it undoubtedly participated in the operation and management of the association. This satisfies the "person" and "enterprise" requirements of the Hastings' RICO claim. In light of this conclusion, we need not determine at this juncture whether the other enterprises proposed by the plaintiffs are sufficient.

### 4. Conclusion

To the extent the plaintiffs' RICO claim rests on violations of the Travel Act as its predicate, the defendants motion to dismiss is denied. Insofar as it rests on mail fraud, the motion to dismiss is granted, but the plaintiffs will be permitted to amend their pleadings if they can provide the requisite degree of particularity regarding the existence of a "pattern" of fraudulent acts.

### C. RESPA

Counts III and IV of the Complaint allege that Fidelity's payment of a yield spread premium to Superior violated RESPA. The statute provides:

(a) No person shall give and no person shall accept any fee, kickback, or thing of value pursuant to any agreement or understanding ... that business incident to or a part of a real estate settlement service involving a federally related mortgage loan shall be referred to any person.

(b) No person shall give and no person shall accept any portion, split, or percentage of any charge made or received for the rendering of a real estate settlement service ... other than for services actually performed.

12 U.S.C. § 2607(a), (b). Even if a plaintiff establishes that a referral fee has been paid or that fee-splitting has occurred, however, there is no violation of RESPA if the payment is "for goods or facilities actually furnished or for services actually performed." 12 U.S.C. § 2607(c)(2). Fidelity argues that the Hastings have not adequately alleged either an illegal referral fee (Count III) or an illegal fee splitting arrangement (Count IV). We consider each argument in turn.

### 1. § 2607(a)—Referral Fees

The regulations promulgated by HUD define a "referral" as "any oral or written action directed to a person which has the effect of affirmatively influencing the selection by any person of a provider of a settlement service." 24 C.F.R. § 3500.14(f)(1). The Hastings suggest that the $4,200 yield spread premium paid by Fidelity to Superior was a referral fee because it had the effect of influencing Superior to select Fidelity as the lender for the Hastings' loan,[10] see Compl. ¶¶ 87–88, and that it was illegal because it did not constitute payment for goods or services, see id. ¶ 89. Fidelity challenges both assertions.

### a. influence on the selection of lender

Two district courts have recently considered whether yield spread premiums have the effect of influencing brokers' selection of lenders, but they have come to different conclusions. In *Barbosa v. Target Mortgage Corp.*, 968 F.Supp. 1548 (S.D.Fla.1997), the court observed that a yield spread premium is designed to reward brokers who procure loans at above-market rates of interest, see id. at 1557. From this premise the court concluded that although an offer of a premium may influence the particular interest rate offered by the broker to the borrower, it does not influence the broker's initial selection of the lender. See id. at 1557–58. In *Dubose v. First Sec. Sav. Bank*, 974 F.Supp. 1426 (M.D.Ala.1997), however, the court considered and rejected *Barbosa*'s reasoning, concluding that the yield spread premium was designed to influence the selection of the lender, see id. at 1431. The court suggested that a loan with an above-market interest rate has no value to the lender in the abstract—it is only when a broker actually refers the loan to the lender that its interest rate matters to the lender. See id. Thus, the court concluded that "[i]t is only for the *referral* of a mortgage with an above-par interest rate that [the lender] is willing to pay [the broker] a yield-spread premium." *Id.*

We think the *Barbosa* court gets the better of this dispute, though its reasoning is missing a few steps. In particular, *Barbosa* relies (at least implicitly) on two basic facts that, although we find them thoroughly believable, have not yet been established in our case.[11] First, the offering of yield spread premiums by lenders to brokers is a widespread, if not universal, practice in the mortgage-lending industry. Second, the premiums offered by lenders are dictated by the operation of a competitive market, meaning that the premiums offered by any particular lender will tend to be very similar to those offered by other lenders. If these two premises are satisfied, we think *Barbosa*'s reason-

---

10. Fidelity and the Hastings seem to agree that providing the financing for a loan is a "settlement service." This view is supported by HUD's regulations. 24 C.F.R. § 3500.2(b) (defining "settlement service" as including the "[p]rovision of any services related to the origination, processing or funding of a federally related mortgage loan").

11. Both *Barbosa* and *Dubose* addressed motions for summary judgment, which gave them a broader pool of facts to draw upon than we have in the context of this motion to dismiss.

ing is persuasive: the offering of yield spread premiums will not influence a broker's choice of one lender rather than another, but only the interest rate the broker will offer to the borrower.[12] A borrower can only claim that a yield spread premium influenced his broker's choice of lender if he or she can show that the premiums offered by that lender were substantially different from the prevailing market rate. We suspect that *Barbosa*'s two implicit premises are satisfied and that the Hastings will be unable to show that Fidelity's premium offerings differed substantially from those of other lenders, but our suspicion is not sufficient to warrant dismissal of the RESPA counts at this stage. We must wait to see what discovery reveals, since it is possible that one of the two premises is false or that Fidelity's premiums departed substantially from the market rate. If so, a jury might reasonably conclude that the offering of a yield spread premium had the effect of influencing Superior's selection of Fidelity as its lender.

### b. Payment for Goods or Services

Even if the yield spread premium payment is shown to have influenced Superior's selection of Fidelity as its lender in the Hastings' transaction, there is no RESPA violation if the payment was made "for goods or facilities actually furnished or services actually rendered." 12 U.S.C. § 2607(c)(2). Fidelity argues that this exception to the general prohibition against referral fees could apply to this case in two different ways.

### i. Goods

Fidelity first argues that the payment of a yield spread premium could be viewed as the purchase price paid by the lender for a "good" actually furnished to it by the broker.[13] This theory has recently been endorsed by one court. *See Culpepper v. Inland Mortgage Corp.*, 953 F.Supp. 367 (N.D.Ala.1997). The *Culpepper* court found that "the premium paid to [the broker] was a market-driven purchase price that [the lender] paid for the Culpeppers' loan. This purchase price was no more a 'referral fee' that induced [the broker's] selection of [the lender] than any other purchase price induces a seller to part with property in exchange for money." *Id.* at 371 (citation omitted). Even if we found this reasoning persuasive, it would be premature to apply it to our case. *Culpepper* was addressing a motion for summary judgment, and it was able to reach the conclusion that the yield spread premium was simply a payment for goods "because the record ... indicate[d] without dispute that the yield spread premium was a reflection of the fair market value of the plaintiffs' loan." *Id.; see also* 24 C.F.R. § 3500.14(g)(2) (indicating that the relationship between the market value of the good provided and the size of the payment should be considered). Given the procedural posture of our case, no such record has been created, so we cannot dismiss the Hastings' RESPA claims at this time under this theory.

Moreover, we have two serious reservations about *Culpepper* that might cause us to decline to apply it even when the record is fully developed. First, we do not share *Culpepper*'s implicit certainty that lenders "purchase" loans from brokers. In our case, for instance, it appears that Superior never owned the Hastings' loan so as to be able to "sell" it to Fidelity. Fidelity was an original party to the loan agreement, see Compl. Ex.

---

**12.** Conversely, if these premises are satisfied, the reasoning of the *Dubose* court becomes unhelpfully circular. Obviously a broker would be reluctant to select a lender who offered no yield spread premiums. But if every lender is offering a similar set of premiums, the premiums will not influence which particular lender a broker chooses, and therefore they cannot be characterized as referral fees.

**13.** The Hastings argue, without the slightest explanation or support, that loans are not "goods" within the meaning of § 2607(c). *See* Pl.s' Br. at 15. RESPA and its accompanying regulations do not define the term. Although the term "goods" is typically used to refer to tangible property, *see* BLACK'S LAW DICTIONARY 694 (6th ed.1990), such a limited definition is not necessary, *see id.* (stating that "goods" has a variable meaning and "may include every species of personal property"). Because RESPA is designed to regulate transactions involving intangible assets, we find it difficult to believe that Congress intended to give the term "goods" a narrow meaning so as to encompass only tangible assets. We conclude that loans are "goods" within the meaning of the statute.

C (identifying Fidelity as the lender); it had no need to "purchase" the loan from anyone. *Cf. Dubose,* 974 F.Supp. at 1431 (rejecting *Culpepper*'s reasoning because in that case "the financial institution, not the broker, [had] an ownership interest in the mortgage from the outset"). The only asset Superior ever had to offer Fidelity was a potential customer, which seems to us to be a prototypical case of a referral of business.

Second, we are concerned that the practical effect of *Culpepper*'s reasoning is to render all yield spread premiums legal under § 2607(c)(2). The *Barbosa* court explained this problem as follows:

> The Court must also reject what plaintiffs characterize as being [The lender's] position—that ... the payment of the yield spread differential merely reflected the value of the 'good' [the broker] provided to [the lender].... [Such a] rule would obliterate any sanction against unearned kickbacks. No rational lender ever pays more for an asset than the asset is worth. If RESPA measures the value of the referral by the worth to the lender of obtaining the mortgage note, then only the unfortunate lender who pays more for the referral than the referral is worth violates the anti-kickback and fee-splitting provisions. Because Congress could not have intended [ § 2607] to impose only an idiot tax, the Court must reject this position.

*Barbosa,* 968 F.Supp. at 1560. We find this argument compelling. Even if many yield spread premium payments are legitimate, it is not necessarily true that all (or nearly all) of them are. Premiums are certainly an effective mechanism through which a lender could pay referral fees to a broker if it were so inclined. We do not think that such transactions should be immune from scrutiny under RESPA.

#### ii. Services

Fidelity's second argument is that the yield spread premium payment reflected "services actually rendered" to it or to the Hastings by Superior. The court in *Barbosa*

accepted an argument of this kind. Since the broker in that case had clearly performed some valuable services for the borrower, *see id.* at 1557, the court proceeded to consider whether the alleged payment for those services (the yield spread premium) bore a " 'reasonable relationship to the market value of the goods and services provided.' " *Id.* at 1561 (quoting 24 C.F.R. § 3500.14(g)(2)).[14] The court refused to make this determination on the basis of "national averages" for broker compensation because brokers offer borrowers highly differentiated services in different transactions, and because this approach would require courts to engage in de facto ratemaking—an approach Congress had declined to adopt either for itself or for HUD. *See id.* at 1561–62. Instead, the court held:

> If arms-length bargaining in the mortgage marketplace set the payment for the broker's services, the payment is reasonable enough within the meaning of RESPA, whether or not plaintiffs can produce twenty omniscient experts who will swear that brokers in California and Maine charge thirty times less for similar services. RESPA sets processes, not prices.

*Id.* at 1562.

Thus, the critical question for our purposes is whether the facts alleged in the Complaint would permit an inference that the yield spread premium payment from Fidelity to Superior did not result from "arms-length bargaining in the mortgage marketplace." This is a close question. From one point of view, Fidelity appears to have maintained an arms-length posture toward the Hastings: it simply offered a series of loan proposals to the Hastings until they accepted one. There is no allegation that Fidelity abused a position of trust with respect to the Hastings, or that they directly engaged in any sort of improper influence. *Cf. Barbosa,* 968 F.Supp. at 1563 (finding as a factual matter that the lender had not engaged in any improper conduct toward the borrower, even though the borrower had accepted the lender's loan offer based on his broker's misrepresentations). But two allegations in the

---

**14.** The *Dubose* court also seems to have accepted this theory, but it did not affect the outcome of that case because the defendants had not produced any evidence that the premiums actually represented compensation for settlement services. *Dubose,* 974 F.Supp. at 1431–32.

Complaint prevent us from dismissing the Hastings' 2607(a) claim on this basis. First, whatever Fidelity's conduct during the negotiations may have been, the Complaint directly alleges that the yield spread premium paid to Superior was unreasonable and did not reflect services actually performed. Compl. ¶ 13. Second, the Complaint also asserts that Fidelity conspired with the Hastings' agent—which *was* in a position of trust and influence—to obtain inflated interest payments for itself. *Id.* ¶¶ 17–19. If we take this as true, which we must at this stage, Fidelity cannot be said to have dealt with the Hastings at arms-length. Accordingly, the motion to dismiss Count III is denied.

### 2. § 2607(b)—Fee–Splitting

Count IV of the Complaint charges Fidelity with engaging in fee-splitting, which is prohibited except when the payment is made "for services actually performed." 12 U.S.C. § 2607(b). The courts that have addressed the question agree that yield spread premium payments can constitute a form of fee-splitting, particularly if the premium payments are duplicative of payments made directly from the borrower to the broker. *See Barbosa,* 968 F.Supp. at 1559: *Dubose,* 974 F.Supp. at 1431–32; *see also* 24 C.F.R. § 3500.14(c) (indicating that "duplicative" or "unearned" fees violate § 2607(b)). As discussed above, the payment from Fidelity to Superior might not have been a reasonable fee for services actually performed, so the Hastings have stated a claim for fee splitting. The motion to dismiss Count IV of the Complaint is denied.

### D. Intentional Interference with Contract

To state a claim for intentional interference with contract a plaintiff must allege: (1) the existence of a valid and enforceable contract between the plaintiff and another party; (2) the defendant's awareness of the contract; (3) an intentional and unjustified inducement of a breach of the contract by the defendant; (4) a subsequent breach by the other party; and (5) damages. *See Williams v. Shell Oil Co.,* 18 F.3d 396, 402 (7th Cir.1994); *United Air Lines, Inc. v. ALG, Inc.,* 912 F.Supp. 353, 361 (N.D.Ill. 1995).[15] As discussed *supra* in Part III. B.1.a, we believe that the Complaint alleges the existence of an agency agreement between the Hastings and Superior. This agreement is supported by substantial consideration because the Hastings paid $2,800 to Superior, and is reasonably clear in its terms—Superior was obligated to use its best efforts to obtain the best interest rate and terms available for the Hastings' mortgage loan. The Complaint alleges that Fidelity knew about this agency contract, that it intentionally induced Superior to breach it in order to enable Fidelity and Superior to profit at the Hastings' expense, and that this conduct was not privileged. Compl. ¶¶ 111, 113–15. The Complaint also alleges that Superior's breach damaged the Hastings by causing them to pay a higher interest rate on their loan than they would have paid had Superior kept its promise. *Id.* ¶ 112. In light of these allegations in the Amended Complaint, the defendants' only argument for dismissal is the plainly meritless assertion that the contract lacked consideration. *See* Def.s' Reply Br. at 18. Count V adequately states a claim for intentional interference with contract.

### E. Inducing a Breach of Fiduciary Duty

A third party may be held liable to a principal for a breach of fiduciary duty by another person if the third party: (1) knowingly participated in or induced the breach of duty, and (2) knowingly accepted the benefits resulting from the breach of duty. *See Faith Freight Forwarding Corp. v. Ruiz,* No. 95 C 7560, 1997 WL 159207, at *5 (N.D.Ill. Mar.24, 1997); *In re Salem Mills, Inc.,* 881 F.Supp. 1109, 1116 (N.D.Ill. 1995); *Regnery v. Meyers,* 287 Ill.App.3d 354, 223 Ill.Dec. 130, 136, 679 N.E.2d 74, 80 (1997). As discussed *supra,* the Complaint adequately alleges that Superior was the Hastings' agent, which necessarily implies

15. It is not clear whether Illinois or New Mexico law should apply to counts V and VI, but since neither party suggests that there is any material difference in the substantive law of the two states with respect to these common law doctrines, we will discuss these claims in terms of Illinois law only.

that Superior owed fiduciary duties to them. The Complaint further alleges that Fidelity intentionally induced Superior to breach these duties in return for a $4,200 payment, and that Fidelity profited from doing so. Compl. ¶¶ 122–23. The cases cited above refused to dismiss claims based on allegations virtually identical to these. *See Faith Freight*, 1997 WL 159207, at *5; *Salem Mills*, 881 F.Supp. at 1116–17. Count VI states a claim for inducing a breach of fiduciary duty.

### F. Consumer Fraud Statutes

The Hastings' final claim is that the defendants violated the consumer fraud acts of Illinois and New Mexico. The defendants' challenge focuses primarily on the Illinois claim, arguing that the ICFA does not apply to the fraudulent conduct alleged in the Complaint. *See* Def.s' Br. at 21–22. To state a claim under the ICFA, plaintiffs must show: (1) that the defendants engaged in a deceptive act or practice; (2) intent on the defendants' part that the plaintiffs rely on the deception: and (3) that the deception occurred in the course of conduct involving trade or commerce. *See Adler v. William Blair & Co.*, 271 Ill.App.3d 117, 207 Ill.Dec. 770, 777, 648 N.E.2d 226, 233 (1995).

We have recently had occasion to consider the applicability of the ICFA to claims by non-Illinois residents. *See Rohlfing v. Manor Care*, 172 F.R.D. 330, 339–40 (N.D.Ill.1997). In *Rohlfing*, we first observed that there is a split of authority regarding whether the ICFA can ever be invoked by plaintiffs who do not reside in Illinois. *Compare Swartz v. Schaub*, 818 F.Supp. 1214, 1214 (N.D.Ill.1993) (holding that only Illinois consumers have standing to assert claims under the ICFA), *with Martin v. Heinold Commodities, Inc.*, 117 Ill.2d 67, 109 Ill.Dec. 772, 778–79, 510 N.E.2d 840, 846–47 (1987) (applying the ICFA to a class that included non-Illinois residents). We then concluded that even if we sided with *Martin* and the other cases permitting claims by non-residents and gave them the most generous possible reading, "the ICFA cannot apply to claims by out-of-state parties unless the 'deceptive act or practice' of which they complain was perpetrated in Illinois." *Rohlfing*, 172 F.R.D. at 340 n. 10.

The Hastings' claims do not satisfy this standard. As discussed *supra* in Part III.B.1.b.ii, the only act of deception adequately alleged in the Complaint is the representation made to the Hastings by Superior's President, John Snyder, that Superior would try to get them the best interest rate and terms available. This alleged misrepresentation was made in New Mexico by a New Mexico corporation to a New Mexico resident. The Hastings attempt to establish the necessary Illinois conduct in two ways. They first point out that Fidelity sent a number of mailings to them from Illinois, see Pl.s' Br. at 21, but this is unavailing since there was nothing deceptive about those mailings. Next, they claim that scheme to defraud them "emanated" from Fidelity's headquarters in Illinois. As we have stated before, vague assertions of this kind are unhelpful because the ICFA does not punish evil thoughts, but deceptive *acts* and *practices*. *See Rohlfing*, 172 F.R.D. at 340 n. 10 (declining to apply the ICFA to claims by non-Illinois residents "merely because a scheme 'emanated' from the minds of persons in Illinois"). We conclude that the ICFA claim must be dismissed. The claim based on the New Mexico Deceptive Trade Practices Act, to which the defendants present no serious objection, shall go forward.

### IV. Conclusion

For the foregoing reasons, the motion to strike is denied and the motion to dismiss is granted in part and denied in part: Counts I and II are dismissed insofar as they allege mail fraud as their predicate act, but not dismissed insofar as they allege Travel Act violations as their predicate act; Counts III, IV, V and VI are not dismissed; and Count VII is dismissed with respect to the ICFA, but not dismissed with respect to the New Mexico Deceptive Trade Practices Act. It is so ordered.